# Staunton

## Grant v. Harris and Others.

### September 7, 1914.

1. ATTORNEY AND CLIENT—*Confidential Communications—Privilege—Waiver.*—Confidential communications between an attorney and his client, made because of that relationship and concerning the subject matter of the attorney's employment, are privileged from disclosure, even for the purpose of administering justice. The privilege, however, is that of the client who may waive it expressly, or it may be implied from his conduct. No particular formality is essential.

2. ATTORNEY AND CLIENT—*Confidential Communications—Waiver—Testimony Given by Client—Case in Judgment.*—A client who goes on the stand in an attempt to secure some advantage by reason of transactions between himself and his counsel, waives the right to object to the attorney's being called by the other side to give his account of the transaction. Such waiver is in no sense contrary to public policy, but is in the interest of truth and justice. In the case in judgment, the client was seeking to have set aside deeds prepared by her counsel and executed in their presence, on the ground of fraud, duress and the lack of capacity on her part to make a deed.

3. FRAUD AND FRAUDULENT CONVEYANCES—*Secret Trust—Fraud on Creditors.*—Where a party conveys his property to another in order to put it out of reach of liability from a threatened suit, with an agreement upon the part of the grantee that he will reconvey it when the danger has passed, as a general rule, he cannot recover back the property if the grantee refuses to reconvey. In such a case neither party, as a rule, can make his own fraudulent conduct a ground of action or defense.

4. FRAUD AND FRAUDULENT CONVEYANCES—*Trust Relation—Failure to Disclose—Knowledge of Other Party.*—Where an agreement is entered into between two persons, the failure of one of them to disclose to counsel for the other who prepared the writing facts within the actual knowledge of such other, is not such fraud, if fraud at all, as would entitle the latter to have the

agreement set aside, for the actual knowledge of the facts relied on as constituting fraud is a complete answer to the charge of fraud in failure of the other party to disclose them.

Appeal from a decree of the Circuit Court of Washington county. Decree for defendants. Complainant appeals.

*Affirmed.*

The opinion states the case.

*L. P. Summers,* for the appellant.

*White, Penn & Penn, H. H. Shelton* and *Powell, Price & Simmonds* for the appellees.

BUCHANAN, J., delivered the opinion of the court.

On the 21st of February, 1910, the appellant, Elizabeth N. H. Grant, and the appellees, W. J. Harris and wife, met together when the two deeds and the agreement, of which the following are copies, were executed:

"This deed, made this 21st day of February, 1910, by and between W. J. Harris and Irma C. Harris, his wife, parties of the first part, and Mrs. Elizabeth N. Grant, widow of John Holland Peter Grant, dec'd, party of the second part, and Thomas Odell, colored, party of the third part.

"That, whereas, the said Mrs. Elizabeth H. Grant, had heretofore, on the 16th day of December, 1909, conveyed her farm hereinafter described, together with all her personal property, including the household and kitchen furniture of every description;

"And, whereas, some dissatisfaction has arisen between the parties as to the form and some of the provisions of the deed, and of the inadequacy of the consideration recited therein:

"Now, therefore, in order to put all questions arising under said conveyance at rest forever between the parties, now, therefore, the parties of the first part hereby sell, grant and convey unto the party of the second part, in consideration of the sum of one dollar, cash in hand paid by the said second party to the first parties, the receipt of which is hereby acknowledged, the farm which the party of the second part heretofore conveyed to the said first parties on the 16th day of December, 1909, by deed duly recorded in the clerk's office of Washington county, in deed book No. 73, page 588, and described therein as 'The farm upon which the party of the first part (meaning then Mrs. Elizabeth H. Grant) now resides, in Washington county, Virginia, near Osceola, and adjoining the lands of George and Thomas Rhea, the widow Williamson, Fisher and others, containing three hundred and thirty acres (330) be the same more or less, together with all of her personal property including the household and kitchen furniture of every description.'

"To have and to hold in fee simple forever, and with covenants of general warranty, and the parties of the first part further covenant that they have a good right to convey and that they do convey all of said real estate and personal property free from liens and incumbrances of every character and kind.

"It is expressly understood, in consideration of the premises aforesaid, that W. J. Harris and Irma C. Harris are to be relieved of all charge and responsibility arising under said deed made simultaneously herewith between Mrs. Elizabeth H. Grant and W. J. Harris and Irma C. Harris in which more specific provisions are made for the support and maintenance of the colored servant, Thomas Odell, he the said Thomas Odell party of the third part joins in this conveyance and grants to Mrs.

Elizabeth H. Grant whatever rights, privileges and property he may take thereunder, and releases unto W. J. Harris and Irma C. Harris whatever rights, privileges and property he may take under said deed.

"This deed, made this 21st day of February, 1910, by and between Mrs. Elizabeth H. Grant, widow of John Holland Peter Grant, party of the first part, and W. J. Harris and Irma C. Harris, his wife, parties of the second part.

"Witnesseth: That whereas, Mrs. Elizabeth H. Grant did on the 16th day of December, 1909, convey by deed certain real estate and personal property to W. J. Harris and Irma C. Harris for considerations deemed inadequate, and dissatisfaction has arisen between the parties as to the form and some of the provisions of said deed, now, therefore, in order to settle all disputes and to put all questions arising under said conveyance at rest forever between the parties, now, therefore, in consideration of the sum of one dollar cash in hand paid by parties of the second part to party of the first part, the receipt of which is hereby acknowledged—the other considerations and covenants hereinafter set forth, the party of the first part doth hereby sell, grant and convey unto the parties of the second part jointly the following described real estate, to-wit:

"The farm lying on the south side of Washington county, Virginia, being the same devised by the last will and testament of John Holland Peter Grant to the party of the first part, and containing about three hundred and thirty (330) acres more or less and adjoining the lands of George and Thomas Rhea, the widow Williamson, Fisher and others. The party of the first part covenants generally the title to the land herein conveyed.

"And in further consideration the said parties agree to pay to Mrs. Elizabeth H. Grant the sum of five hun-

dred dollars annually, payable quarterly on demand Mrs. Elizabeth H. Grant, during her natural life, for her support and maintenance.

"And, whereas, Mrs. Elizabeth H. Grant assigned and delivered four municipal bonds executed by the city of Bristol, Tennessee, to said second parties, bearing four *per cent.* interest, payable semiannually, and due October 1, 1921, in part consideration of which said W. J. Harris and Irma C. Harris executed their joint note to said Mrs. Elizabeth H. Grant or order, payable in twelve months after date, from February 7, 1910, interest at four *per cent.*, payable semi-annually, a part of the consideration being for the purchase of the land herein conveyed.

"And in further consideration the said W. J. and Irma C. Harris agree to pay to Mrs. Elizabeth H. Grant's heirs, administrators, executors or assigns two years after her death without interest the sum of five thousand dollars ($5000).

"And if Thomas Odell, the old colored servant of Mrs. Elizabeth H. Grant, should survive her, then W. J. Harris and Irma C. Harris in further consideration agree to pay to Thomas Odell the sum of one hundred dollars *per annum* during his natural life, payable quarterly on demand on and after the demise of said Mrs. Grant. None of the said annuities shall bear interest until after maturity.

"The said five hundred dollar annuity, payable to said Mrs. Grant, shall commence to run from the 21st day of February, 1910.

"This deed is to be read in connection with another deed of same date, simultaneously executed herewith between the said first and second parties, and a third party, Thomas Odell.

"The party of the first part, Mrs. Elizabeth H. Grant,

hereby expressly retains a vendor's lien on all the real estate herein conveyed to the parties of the second part to secure first, the said annuity of five hundred dollars payable quarterly, to secure the payment of said note for two thousand dollars ($2000.00) under date the 7th day of February 1910, to secure the payment of said sum of five thousand dollars payable to Mrs. Elizabeth H. Grant's heirs, administrators, executors, or assigns, two years after her death, to secure the said annuity of one hunded dollars to Thomas Odell after the demise of said Mrs. Grant.''

"This agreement, made this 21st day of February, 1910, by and between Elizabeth H. Grant, party of the first part, and W. J. Harris and Irma C. Harris, parties of the second part, witnesseth:

"That in consideration of two conveyances of even date herewith, and executed simultaneously between the parties hereto, the party of the first part sells, grants, transfers and delivers to the parties of the second part all of the personal property on said farm, except her household and kitchen furniture which she owned on the 16th day of December, 1909, and except further one milk cow, to be selected by Mrs. Grant, 1 shoat, two buggys; all buggy and wagon harness there on the 16th day of December, 1909, one stand of bees, all municipal bonds, save the four Bristol, Tennessee, bonds mentioned in one of said deeds sold to said parties, and except further all United States government bonds, all stock and bonds of every character. (The iron safe is to belong to the parties of the second part.)

"The said Mrs. Elizabeth H. Grant is to vacate said premises not later than sixty days from this date, and said second parties agree to move Mrs. Grant and her said personal property to any point in Washington county, Virginia, not to exceed six miles, or to Meadow

View station if she goes out of said county free of charge.

"It is further agreed that during the time that Mrs. Grant remains on said premises the $500.00 annuity is to be credited with said time.

"Witness our hands and seals this the 21st ·day of February, 1910."

The object of this suit, which was instituted by the appellant, Mrs. Grant, was to set aside and annul the last two of the instruments above set out, and certain other deeds executed by the appellant to the appellees, Harris and wife, in the preceding December in reference to the same property, upon the ground that they were fraudulently procured. Both in the petition for the appeal and in the briefs of opposing counsel it seems to be conceded that the first question to be considered is the admissibility of the testimony of Messrs. Bailey and Price, who acted as the attorneys of the appellant when the said instruments of February 21 were executed, and the settlement which they were intended to evidence and carry into effect was made.

It is conceded, and if it were not it is well settled, that confidential communications between an attorney and his client made because of that relationship and concerning the subject matter of the attorney's employment, are privileged from disclosure, even for the purpose of administering justice. See *Parker* v. *Carter,* 4 Munf. (18 Va.) 273; *Chahoon* v. *Com'th,* 21 Gratt. (62 Va.) 822, 836-840; *Tate* v. *Tate,* 75 Va. 522, 532-3; note to *Collins* v. *Hoofman,* 26 Am. & Eng. Ann. Cases, 1, 4, and *Kelly* v. *Cummens,* 20 Do. 1283, 1285-6, where the cases generally are cited.

This rule of law is for the benefit of the client and may be waived. *Tate* v. *Tate, supra,* 533. But no particular formality is essential. It may be expressed or implied

from the conduct of the client. *Blackburn* v. *Crawford,* 3 Wall, 175, 18 L. Ed. 186; *Clover* v. *Patton,* 165 U. S. 394, 407-8, 17 Sup. Ct. 411, 41 L. Ed. 760.

There was no express waiver in this case. The question, therefore, is, did the appellant waive her privilege impliedly or by her conduct.

By the allegations of the appellant in her bill and amended bills and her own testimony given to sustain the allegations of her pleadings, she sought to show that she ought not to be bound by the settlement made between her and Harris and wife, as evidenced by the deeds and agreement executed on the 21st day of February, 1910, largely upon the ground that Messrs. Bailey and Price who acted as her attorneys on that occasion were not employed by her to advise and assist in settling her differences with Harris and wife; that she sent for Mr. Bailey merely for the purpose of having him take charge of certain bonds which Mr. Harris was endeavoring to get possession of; that Judge Price was not present at her instance, but upon the request of Mr. Harris; that in the conferences of Messrs. Bailey and Price with her and Mr. Harris, the latter's wishes and not hers were in every particular followed; that when the deeds and agreement of that date were executed and Harris and wife re-conveyed to her lands theretofore conveyed to them, it was done at the suggestion of some one, by whom she did not know, and at the same time she was required to convey all her lands, stock, farming implements, etc., to Harris and wife; that she had no knowledge at that time of the contents of the last mentioned deed; and that when it was obtained she was without capacity to know what she was doing and was under duress. She also attempted to show by other evidence that Messrs. Bailey and Prince received fees from Mr. Harris for services rendered him in bringing about said settlement.

The case made by the appellant's pleadings and her own evidence tends to show that Messrs. Bailey and Price, who acted as her counsel in making the settlement evidenced by the deeds and agreement of February 21, 1910, were not employed by her for that purpose; that in making the said settlement they were doing and having things done which she did not authorize, approve or understand; that they were acting in accordance with the wishes of Mr. Harris in all things, and that she was required to do things to her prejudice when she did not know, and did not have the mental capacity to understand what she was doing, and when she was under duress. Under these circumstances it would seem clear that the client should be held to have waived her privilege and that the attorneys who acted for her in the transaction sought to be set aside should be permitted to give their version of the transaction, not only in the interest of justice to the parties to the litigation, but also for the protection of the attorneys themselves. To hold otherwise would subject the attorney to scurrilous and unjust attacks, and convert the rule which was intended only as a shield for the client's protection into a weapon of offense against others. The authorities generally hold that a client who goes upon the stand in an attempt to secure some advantage by reason of transactions between himself and his counsel, waives his right to object to the attorney's being called by the other side to give his account of the matter. Such waiver, it is held, is in no sense contrary to public policy, but is in the interest of truth and justice. See *Kelly* v. *Cummens, supra,* and note, p. 1286, where numerous cases are cited, among them *Hunt* v. *Blackburn,* 128 U. S. 464, 9 Sup. Ct. 125, 32 L. Ed. 48.

In delivering the opinion of the court in the latter case, Chief Justice Fuller, in holding that the client had

waived her privilege as to the disclosure of confidential communications between herself and her attorneys, said: "Defendant Blackburn insists, however, in her answer that the part she took in the litigation of these two cases was the result of misplaced confidence in her counsel, by whom she alleges she was deceived, misadvised and misled; that she was ignorant of her rights; and that she ought not to be estopped in the premises; while at the same time it is objected on her behalf that her attorney, on the ground of privileged communications, should not be permitted to defend himself by testifying to the facts and circumstances under which he advised her, and the advice which he actually gave."

"The rule which places the seal of secrecy upon communication between client and attorney is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure. But the privilege is that of the client alone, and the rule prohibits the latter from divulging his own secrets. And if the client has voluntarily waived the privilege, it cannot be insisted on to close the mouth of the attorney. When Mrs. Blackburn entered upon a line of defense which involved what transpired between herself and Mr. Weatherford (her counsel) and respecting which she testified, she waived her right to object to his giving his own account of the matter."

The next question is, does it satisfactorily appear from all the evidence in the case, including that of Messrs. Bailey and Price, that the settlement between the appellant and Harris and wife, evidenced by the writings executed on the 21st of February, 1910, was made under circumstances which entitle the appellant to have such settlement set aside?

It appears that Dr. Holland Grant died in March, 1907, leaving a will by which he devised and bequeathed to his widow, the appellant, all of his real and personal estate, expressing a desire that at her death a large portion of his estate should pass to institutions of the Roman Catholic Church, of which he and his wife were members. This latter provision was considered void. Among the property devised was a farm of 330 acres, upon which the testator resided at the time of his death, and upon which his widow continued to reside. In January, 1909, she conveyed the farm, reserving a life estate therein, to Mrs. C. C. Hawthorne for the consideration of $13,000, the receipt of which is acknowledged in the deed, though no part of it seems to have been paid. Becoming dissatisfied with that transaction, the appellant advised with her pastor, Father Myer, who in turn advised with Mr. Harris, one of the appellees. The appellant, through or at the instance of Messrs. Myer and Harris, consulted counsel, Messrs, Honaker and Campbell, and Judge A. A. Phlegar, in reference to that transaction. At the conference between the appellant and her said attorneys, it was considered, it seems, doubtful whether a suit to set aside that conveyance could be maintained, and it was deemed best first to make an effort to obtain a reconveyance of the land from Mrs. Hawthorne to the appellant, if it could be had upon any reasonable terms. Thereupon Messrs. Myer and Harris, at the instance of the appellant, saw Mrs. Hawthorne, and secured from her a reconveyance of the farm, upon the payment of $500, though the appellant had authorized the payment of a larger sum, if necessary, to secure that end. This conveyance was executed in December, 1909. On the same day the appellant executed a will, the draftsman being Father Myer, by which she gave all her property, real and personal, to Miss Mary Myer, sister of Father

Myer, for charitable purposes, except $5,000 which was
to go to Miss Myer for services and favors rendered, and
the interest on $1,000, which was to be paid annually
during his life to the appellant's colored servant, Thomas
Odell. Mr. Harris was one of the witnesses to this will.
On the next day Father Myer and Mr. Harris returned
from the appellant's home some twenty miles to Bristol,
and that evening Mr. Harris had a conversation with
Mrs. Hawthorne, in which she stated, either conditionally
or unqualifiedly (the witnesses differ as to what was
said) that she was going to bring suit against the ap-
pellant for slanderous words uttered, or alleged to have
been uttered by the appellant as to the writing of certain
anonymous letters received by the appellant before her
conveyance to Mrs. Hawthorne. Mr. Harris immediately
informed Father Myer of his conversation with Mrs.
Hawthorne, and that she was threatening to sue the ap-
pellant for $20,000. Thereupon Father Myer and Mr.
Harris consulted together and agreed, as the weight of
the evidence tends to show, that it would be best for the
appellant to convey her farm to some responsible per-
son to be held by him for her until after the danger from
the threatened slander suit had passed. Father Myer
so wrote the appellant and advised her to convey the farm
to Mr. Harris for the time being, and gave the letter to
Mr. Harris, who carried it to the appellant. Mr. Harris
denies that he knew the contents of the letter and states
that the appellant said when she read Father Myer's
letter that she would not do what he advised. Miss Mary
Myer also wrote a letter to the appellant at the same
time, urging her to convey her farm to Mr. Harris, as
her brother advised. Mr. Harris went immediately to
the home of the appellant, who on the next day executed
a deed, and in two or three days, to cure some defects or
supposed defects in that conveyance, executed another

substantially like the first, to Harris and wife, in which she conveyed the said farm together with all her personal property, as stated in the deeds in consideration of one dollar, and upon the further consideration that "The parties of the second part hereby agree and bind themselves, heirs and assigns, to live with the party of the first part and her colored servant, Thomas Odell, on said farm and take care of and maintain them in a good, proper and faithful manner during their lives, and to pay all bills for necessary medical attention, medicines, and funeral expenses of the said Mrs. Elizabeth H. Grant and Thomas Odell."

At the time of the death of appellant's husband she was the owner of six United States bonds of $1,000 each, of four Bristol city bonds of $500 each, and a certificate of deposit in the First National Bank of Bristol, Tennessee, for $1130. She was still the owner of the larger portion of the said property when she made the said conveyance to Harris and wife in December, 1909. Harris and wife, immediately after the last mentioned conveyances, moved upon and took possession of the said farm. They and the appellant for a little while seem to have gotten along amicably, but soon differences arose between them. This was the situation on the 21st of February, 1910, when the two deeds and the agreement of that date were executed.

The grounds upon which the appellant seeks to have the settlement or compromise evidenced by the said writings of that date set aside is thus stated in her last amended bill: "Your complainant would further show unto your honor that she absolutely had no knowledge of the contents of the purported deeds of reconveyance and conveyance and contract by way of compromise of date February 21, 1910, although the papers were read to her at the time of their execution;" that "your com-

plainant was so much incapacitated by reason of her weak mental and physical condition and indulgence in intoxicating liquors, and by fear of the said W. J. Harris, that she did not disclose to any one at that time the trust relation which existed between herself and the said W. J. Harris as above set out; that the said deeds and contract were obtained from your complainant at a time when she was without capacity to know what she was doing and at a time when your complainant was laboring under duress, and was afraid to refuse to do any or everything that the said W. J. Harris required of her while she was in his house."

Although the burden was upon the appellant to sustain these charges by satisfactory proof, she has wholly failed to do so. The evidence clearly shows that Messrs. Bailey and Price were her counsel when the said settlement or compromise was effected and the deeds and contract evidencing it were executed; that her counsel reached the Grant home about noon on that day; that after dinner they had a private conference with the appellant in the parlor, in which no one was present except those three, lasting some two hours, in which she gave a pretty full history of her transactions with Mrs. Hawthorne and Mr. Harris in reference to the farm; that she informed her said counsel that Harris was extravagant and wasteful, and that if he kept on spending money as he was then doing he would soon run through with everything they had; that he had brought his father-in-law, mother-in-law, and brother-in-law, who were French people, to the house to live with them; that they were not used to her way of living; and that she did not think they could get along well together; that she was very anxious to get back her farm, either by a suit to set aside the conveyance to Harris and wife, or by obtaining a reconveyance from them as she had done from Mrs. Hawthorne;

that her counsel after considering the case had grave doubts about her right to have the conveyances to Harris and wife set aside, and so informed her; that they then approached Harris and wife to ascertain what they would take to reconvey the farm, and that the best proposition Harris and wife would offer was $7,000 in cash and the surrender of a $2,000 note which Mr. Harris owed the appellant for the proceeds of Bristol city bonds; that the appellant declined to accept that proposition; that various propositions and counter-propositions were made until finally the parties, late in the evening, agreed to settle upon the terms set out in the two deeds and contract executed on that day; that the said writings were then prepared, a justice sent for to take the acknowledgment of the parties, whose expense it was agreed by the appellant and Harris and wife should be borne equally by them; that when the writings had been prepared they were carefully read to the parties in the presence of the justice by one of the attorneys and their provisions fully explained. Mr. Bailey, who had known the appellant for some forty years and had been counsel for her and her husband on several occasions during the time, testified that the appellant. while not brilliant, was a woman of good hard common sense, that she was not under the influence of intoxicating drink, and that he has no doubt of her competency to enter into the settlement now sought to be set aside. While Judge Price had never seen the appellant until that day, he testifies that he and Mr. Bailey in their conference with her asked her a great many questions, and that she answered all of them with as much intelligence as any uneducated woman might be expected to answer; that she stayed in the room where he and Mr. Bailey were most of the evening; that if she was under the influence of whiskey or had any whiskey she showed no signs of it,

and that he does not think she was, and that he had no
doubt of her "mental capacity to understand and appre-
ciate every detail of the transaction that was had there
on that occasion;" that he was somewhat troubled over
the situation when he "first went there, but after a con-
ference with her I was satisfied that, while she had used
bad judgment in her conveyance to Mr. and Mrs. Harris,
she fully appreciated the fact and. that she also ap-
preciated the importance of the settlement that we made
for her; that she seemed to understand and appreciate
the fact that we were fixing a certain sum of $500 that
was secured to her by a vendor's lien which bound the
land. She also appreciated the fact that we had elim-
inated any question about the future possession and
ownership of the government bonds." It further ap-
pears that the appellant talked freely to her counsel
about Mr. Harris and the reasons why she did not think
they could get along well together, but she did not in-
timate to them that she was under any duress or re-
straint on the part of Harris. In reply to the question,
whether Mr. Harris, any of his people, or any one else
used any compulsion to secure the execution of the
papers of February 21, Judge Price answers, "Ab-
solutely none. She executed those papers upon the ad-
vice of counsel, and after a thorough discussion and un-
derstanding to them."

Mr. D. C. Cummings, who was appointed justice by
the Circuit Court for Washington county, and before
whom the acknowledgments of the writings evidencing
the said settlement were taken, and who was vouched as
a witness by both parties, testified that he knew nothing
about what was in the writings until Mr. Price and Mr.
Bailey read them paragraph by paragraph, you might
say, and explained it to her; and I sat and listened. I
was in the room. When they got through I asked her if

42

she was ready to sign it, and she said she was and got up and signed it. He further testified that there was nothing said or done by the appellant to indicate that she did not know what she was doing; that she did not appear to be under the influence of liquor; and that there was not in his presence any compulsion by anyone to cause the appellant to sign said writings.

Harris and wife, the other parties present when the said writings were executed, in their depositions further contradict all of the appellant's statements tending to show that she was under duress, the influence of whiskey, or did not understand what she was doing at that time. Without considering their depositions, however, we have the evidence of the appellant on the one side as to the circumstances under which the writings of the 21st of February were executed, and on the other that of her counsel, Messrs. Bailey and Price, and of Mr. Cummings, the justice before whom the writings were acknowledged. Each party took the depositions of witnesses who were not present on that occasion as to the mental condition of the appellant. This evidence is conflicting and does not strengthen the appellant's case.

It is clear from the whole evidence that the appellant has failed to sustain the charges of her bills, that at the time she made the settlement of February 21, 1910, and executed the writings carrying it into effect, she was physically and mentally incapable of transacting business, and did not know what she was doing.

It is insisted, however, that even if it be held that the appellant was mentally capable of making said settlement, it is not binding upon her because Mr. Harris bore a trust relation to her under the deeds of December, 1909, by which he acquired title to said farm and did not disclose that relation to her counsel when said settlement was made. Mr. Harris denies that when the De-

cember deeds were executed there was any agreement between the appellant and himself that he was to hold the property conveyed for the benefit of the appellant, or upon any other terms than those stated in the said deeds, and of course he did not inform her counsel of a trust relation whose existence he denied. Neither did the appellant, who insists upon the existence of such trust relation, make it known to her counsel. The result was that when her counsel advised the appellant to make said settlement, they were ignorant of any such relation, if it existed, as claimed by the appellant. Conceding that the conveyances of December, 1909, were made, as claimed by appellant, to Harris and wife upon the secret agreement that the property conveyed was to be held for the appellant's benefit and reconveyed to her when the danger from the threatened suit for slander had passed, is she entitled to have the settlement or compromise of February 21, 1910, set aside, because her counsel who advised the settlement were ignorant of that fact? The trust relation relied on, upon the appellant's own showing, was based upon the fraudulent conduct of the grantor and grantees in the said deeds, for the purpose of placing the grantor's property beyond the reach of any recovery that might be made in an action brought by Mrs. Hawthorne. In such a case neither party, as a general rule, can make his own fraudulent conduct a ground of recovery or of defense. *Nunnally* v. *Stokes, ante,* p. 472, 82 S. E. 79, and authorities cited. If the settlement or compromise of February 21, 1910, had not been made and this were a suit to set aside the conveyances of December, 1909, it is doubtful whether under our decisions, the facts and circumstances disclosed by the record would take it out of the general rule.

In the case of *Nunnally* v. *Stokes, supra,* recently decided by this court, this question was considered, and

some of our decisions cited. In referring to *Harris* v. *Harris,* 23 Gratt. (64 Va.) 737. a leading case in this court, it was said: ''In that case the fraudulent transaction was between father and son, and the father had strongly advised the son to enter into the (fraudulent) contract. In this case (*Nunnally* v. *Stokes*) the grantor was the sister-in-law of the grantee who advised and persuaded her to make the conveyance. In neither case did the liability in fact exist to defeat the collection of which the fraudulent transaction was entered into. In *Harris* v. *Harris,* the decisions of this court, including *Austin's Admr.* v. *Winston's Admr.,* 1 Hen. & Munf. [(11 Va.), 3 Am. Dec. 583] 33, so much relied on by the appellant's counsel, were cited and commented on, and the conclusion reached that the facts averred in the plea in that case did not take it out of the general rule that a party, whether plaintiff or defendant, cannot make his own fraudulent conduct a ground of defense or recovery.'' *Nunnally* v. *Stokes, supra,* appealed strongly to the court for relief in favor of the complainant, but the court felt compelled to deny it and in doing so said: ''It is sufficient to say, as was said by Judge Allen in *Owen* v. *Sharp,* 12 Leigh (39 Va.) 427, that with every disposition to deprive the fraudulent grantee of the fruits of his iniquity, as charged in the bill, 'it seems to me that the repeated decisions of this court, the principles which regulate courts of equity and considerations of public policy preclude us from giving relief in this case!'' '

Whether or not the facts and circumstances disclosed by this record would be sufficient if the rights of the parties depended upon the deeds and alleged secret trust of December, 1909, to take it out of the general rule, need not be decided, for that is not this case. In the settlement or compromise made in February following it was

the duty of the appellant herself to have informed her counsel of the alleged secret agreement or trust, as well as of all other facts and circumstances within her knowledge affecting her rights. Mr. Harris denied that there was any such agreement or trust, and insists that the said deeds of December set out truly the agreement between the parties, and he ought not to be deprived of the benefit of the settlement or compromise subsequently made because he did not disclose such secret trust (the existence of which he denies) to her counsel. His failure to disclose it was clearly not such fraud, if fraud at all, as would entitle the appellant to have the settlement set aside on that ground, for the appellant's actual knowledge of the facts relied on as constituting fraud is a complete answer to such charge of fraud. See 1 Am. & Eng. Enc. Law & Pr. 652; 8 Cyc. 527-8; *King* v. *Williams,* 71 Iowa 74, 32 N. W. 178; *Woodford* v. *Marshall,* 72 Wis. 129, 39 N. W. 376; *Richmond* v. *Atlantic, &c.* 129 Ga. 133, 58 S. E. 874, 878; *McCoy* v. *Quigly,* 55 Iowa 315, 7 N. W. 633.

Upon the whole case the court is of opinion that there is no error in the decree appealed from and that it must be affirmed.

*Affirmed.*