LANSBURGH et al. v. McCORMICK et al.

(Circuit Court of Appeals, Fourth Circuit. May 4, 1915.)

No. 1290.

1. JUDICIAL SALES ☞9—COLLATERAL ATTACK—ERROR AS TO PLACE OF SALE.
    That a public sale of real estate under a decree of a federal court was through mistake ordered and held at a place other than the courthouse of the county in which the land was situated, as required by Act March 3, 1893, c. 225, § 1, 27 Stat. 751 (Comp. St. 1913, § 1640), is not jurisdictional, and does not render the sale void nor subject to collateral attack.
    [Ed. Note.—For other cases, see Judicial Sales, Cent. Dig. § 33; Dec. Dig. ☞9.
    Collateral attack on judicial sale, decree or order therefor or confirmation thereof, see note to Wood v. Browning, 100 C. C. A. 172.]

2. JUDICIAL SALES ☞33—COLLATERAL ATTACK—ESTOPPEL.
    A defendant in a decree ordering a sale of real estate, who advertised the sale by pamphlets, and, although present, neither then nor in his objections to confirmation made any objection because the sale was not held at the place designated by statute, is estopped to attack its validity collaterally on that ground.
    [Ed. Note.—For other cases, see Judicial Sales, Cent. Dig. § 70; Dec. Dig. ☞33.]

3. TAXATION ☞674—TENANCY IN COMMON ☞3—TAX TITLE—CAPACITY OF PURCHASER—RELATIONSHIP TO TITLE.
    A decree established a lien in favor of the complainant in the suit against a large tract of land owned by the defendant, and also authorized the complainant to bring actions in the name of the defendant against trespassers claiming portions of the land; the costs and expenses, so far as uncollectible, to be a lien. Held, that such authority did not make him a tenant in common with the defendant so as to deprive him of the right to purchase the land at tax sale as against defendant, especially as defendant, although having knowledge of the purchase during nine years, made no offer to pay the taxes or redeem from the sale.
    [Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1357–1360; Dec. Dig. ☞674; Tenancy in Common, Cent. Dig. §§ 5–17; Dec. Dig. ☞3.]

4. TAXATION ☞615—TAX TITLES—VALIDITY—CONSTRUCTION OF STATUTE.
    All requirements of the law leading up to tax sales which are intended for the protection of the taxpayer against surprise and the sacrifice of his property are to be regarded as mandatory and strictly enforced, but those provisions designed merely for the guidance of the officers in order to secure due and orderly conduct of the public business concern the state only, and as to the individual taxpayer are to be regarded as directory.
    [Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1264; Dec. Dig. ☞615.]

5. TAXATION ☞615—SALE OF LAND FOR TAXES—CONSTRUCTION OF STATUTE.
    Code, W. Va. 1913, c. 31, § 25 (sec. 1084), which in effect provides that a tax deed shall vest the grantee with title notwithstanding any irregu-

larity in the proceedings, unless the same was prejudicial and prevented the redemption of the land by the former owner, construed, and *held* constitutional and valid.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1264; Dec. Dig. ☞615.]

6. TAXATION ☞734—TAX SALES—VALIDITY.

Irregularities in the assessment of land and in proceedings for its sale for delinquent taxes *held* not such as to invalidate the sale as against the former owner.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1408, 1170-1473; Dec. Dig. ☞734.]

Appeal from the District Court of the United States for the Southern District of West Virginia, at Charleston; Henry Clay McDowell, Judge.

Suit in equity by Sidney Lansburgh, administrator of the estate of Max Lansburgh, deceased, Rebecca Lansburgh, widow, and Sidney Lansburgh and others, heirs at law of Max Lansburgh, against Henry B. McCormick, Vance C. McCormick, William M. Ritter, and the Pocahontas Coal & Coke Company. Decree for defendants, and complainants appeal. Affirmed.

James M. Payne and W. E. R. Byrne, both of Charleston, W. Va., and W. C. Prentiss, of Washington, D. C. (W. R. Lacey, of Oskaloosa, Iowa, and R. G. Linn, of Charleston, W. Va., on the brief), for appellants.

Geo. E. Price and Malcolm Jackson, both of Charleston, W. Va., Z. T. Vinson, of Huntington, W. Va., and A. W. Reynolds, of Princeton, W. Va. (James L. Hamill, of Columbus, Ohio, Jos. S. Clark and Henry A. McCarthy, both of Philadelphia, Pa., Anderson, Strother & Hughes, of Welch, W. Va., Vinson & Thompson, of Huntington, W. Va., and J. J. Divine, of Welch, W. Va., on the brief), for appellees.

Before KNAPP and WOODS, Circuit Judges, and WADDILL, District Judge.

WOODS, Circuit Judge. The primary issue in this cause is whether the Pocahontas Coal & Coke Company has acquired the title of Max Lansburgh to a tract of land containing about 44,000 acres. This issue depends on the validity of two sales of the land as the property of Lansburgh, under which the coal company claims; one a sale by the order of the District Court October 20, 1897, of 16,504 acres, and the other a tax sale of the entire tract December 13, 1897. Lansburgh filed his bill on July 11, 1907, to set aside these sales. Henry McCormick, who was the purchaser at both sales, having died, his sons, Henry B. McCormick and Vance McCormick, as his executors, and the former in his own right, and Wm. M. Ritter, who received title from McCormick and conveyed to the coal company, were made codefendants with the coal company. An accounting for timber cut and coal mined, and generally for the rents and profits, was sought against all the defendants. Lansburgh having died on June 10, 1910,

the suit was revived and an amended bill filed in the name of his administrator and heirs at law. The District Court, after a full hearing on the merits, dismissed the bill in a formal order.

The judicial sale was made under these circumstances: On June 10, 1889, Lansburgh entered into a written agreement with Henry McCormick to convey to him 10,000 acres of the large tract above mentioned, to be ascertained and surveyed as indicated in the paper, for the price of $35,000, of which McCormick paid $23,353.33. A dispute arose as to the land to be conveyed, and Lansburgh offered to refund the money paid and annul the agreement. After refusing this offer McCormick brought suit for specific performance, and by his amended bill asked that if it should turn out that Lansburgh could not make a good conveyance, then that the court decree the return of the purchase money paid, making it a lien on the land. The litigation resulted in the rescission of the contract and a judgment against Lansburgh for $27,899.37, which included the cash payment made by McCormick and taxes paid by him pending the suit. The decree provided that if Lansburgh should not pay the amount found against him within 60 days, two parcels of the land, aggregating 16,504 acres should be sold to pay the debt. At a sale made under this decree October 20, 1897, McCormick bought the land for $23,333.33. Lansburgh filed exceptions to the commissioner's report of sales, but the sale was confirmed. After applying the proceeds and a sum paid into court by the Panther Lumber Company for timber cut, a balance of $12,623.65 remained in favor of McCormick against Lansburgh, which was decreed to be a lien on the remainder of the land.

[1] This sale is attacked as a nullity because under the order of the court the sale was made in the city of Charleston, and not, as required by the federal statute, on the premises or at the courthouse door of McDowell county, in which the land lies. The court having jurisdiction to order the sale, the mistake of directing that it be made at a place different from that required by the statute did not make the sale void for want of jurisdiction, but was an error to be corrected by appeal or by direct application to the trial court. Godchaux v. Morris, 121 Fed. 482, 57 C. C. A. 434. This court, it is true, held in Cumberland Co. v. Tunis, 171 Fed. 352, 96 C. C. A. 244, that a purchaser who had purchased at a private sale, ordered by the court, contrary to the statute requiring sales to be made at auction, should be relieved from his purchase even after confirmation, upon his own application to the court wherein the cause was pending. But this is very far from holding that a purchaser who is invited by the court to rely on its order of sale would be deprived of his purchase after he has paid his bid and received the court's title, because the sale had not been made at the place designated by the statute. Indeed the court recognizes and distinguishes the case of Godchaux v. Morris. The cases holding sales made by merely ministerial officers at a place not authorized by statute to be void obviously stand on a different footing.

[2] But if the law were otherwise, Lansburgh's conduct in requesting the judge to have the decree of sale carried out as soon as possible, in advertising the sale by pamphlets, in making no objection, though

present at the sale, and in filing exceptions to the report of sale, which made no allusion to the error of ordering the sale at Charleston, would estop him from now having the sale annulled after the rights of third parties have become involved. Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79; Cumberland Co. v. Tunis, supra.

[3] The objections to the tax sale of the entire tract made on December 13, 1897, are more serious. Against this sale it is first alleged that Henry McCormick was either a tenant in common with Lansburgh, or stood in such trust relation to him that he could not acquire title against him at a sale for taxes. The position rests mainly on this provision of the order confirming the judicial sale above discussed:

"And, the court being advised that there are divers and sundry persons within the bounds of said tract of 50,000 acres, who claim to hold adversely tracts and parcels of land by titles inferior to the title of Lansburgh, and who have been and are committing trespass upon the same, and there being a possibility that the statute of limitations may be successfully pleaded should the prosecution of this action be extended, and no action speedily taken to stop the running of the statute, it is hereby ordered that unless the said Lansburgh, within 30 days from the date of this decree, institute actions of ejectment in his own name to recover such tracts or parcels of land, then the said complainant, Henry McCormick, or his assignee or assignees, is hereby authorized and empowered to institute and prosecute in the name of the said Lansburgh such action or actions of trespass or both as he may be advised, the expenses and costs of which, however, to be advanced by the said McCormick, whether instituted by the said Lansburgh or by the said McCormick in his name, so much thereof as shall not be recovered from the defendants in such actions of ejectment to be a charge upon said lands, subject to the order of the court."

This order was made at the instance of McCormick and opposed by Lansburgh. It therefore amounted to a voluntary undertaking on the part of McCormick to advance the expenses and look to the land for repayment if they could not be collected from the alleged trespassers. The order clearly made a community of interest in the litigation between Lansburgh and McCormick, and contemplated that any recovery of the land should be for the benefit of both—Lansburgh as owner and McCormick as lienholder—and that McCormick should have a further lien for his expenses. But it did not impose upon McCormick any other duty to Lansburgh, or any burden to pay the taxes on any portion of Lansburgh's land; and the record affords no evidence that McCormick in any other way assumed burdens either expressly or impliedly. Suits were brought in the name of Lansburgh for the recovery of the lands referred to, the declaration being signed by E. L. Buttrick, S. L. Flournoy, and M. F. Stiles as plaintiff's counsel. Mr. Flournoy was counsel for Lansburgh in his litigation with McCormick. He and Mr. Buttrick, McCormick's attorney in the litigation with Lansburgh, died before the trial of this cause. Mr. Stiles was brought in to assist in the ejectment cases, and testified to his recollection of the relations of the parties. His evidence and the letters of Mr. Flournoy written to Lansburgh's counsel in Washington show that McCormick retained all the attorneys in the ejectment suits; that Flournoy communicated to Lansburgh's counsel in Washington, where Lansburgh lived, his acceptance of employment from McCormick because of his belief that McCormick and Lansburgh had a common interest in the

recovery of the land, and that it would inure to Lansburgh's benefit; that although Mr. Stiles had nothing to do with the tax sale, his impression was that McCormick made the purchase at the sale as a means of perfecting the title against the alleged trespassers; and that it was not intended that the title acquired by McCormick should be set up against Lansburgh. If this were all, there would be ground to say that McCormick sustained such relation to Lansburgh that he could not set up the tax sale against him. But on the other hand, there are these considerations: Lansburgh knew the taxes were assessed against his land, and he took no notice of the matter, though he must have known a sale would result unless they were paid; McCormick had assumed no obligation to pay the taxes, and Lansburgh had no reason whatever to suppose he would pay them; notice by letter from Mr. Flournoy to Lansburgh's home counsel that McCormick's son had bought at the tax sale, warning that he would lose the land unless he redeemed it within a year, and urgent advice that he take action and redeem the land were all ignored. This letter shows that Flournoy considered the purchase adverse to Lansburgh, and put him on notice that McCormick did not understand he was under any duty to pay the taxes or hold the purchase in trust. Thus Lansburgh not only refused to pay the taxes, but refused to redeem the land after it was sold for taxes. Even if there had been such relation and such concert of action contemplated at the time the order providing for the ejectment suits was made as would preclude McCormick from acquiring a tax title against Lansburgh, it is impossible to resist the conclusion that Lansburgh repudiated the relation and left McCormick to take care of his own interest as best he could. This refusal was continued by inaction for nine years, without recognition in any way by Lansburgh of a correlative duty to pay the taxes or the purchase money of the tax sale. Equity must hold such a decisive and indisputable repudiation of the burdens to carry with it a repudiation of the relation out of which the burdens arose, and an abandonment of any claim to benefits from such relation. Beyond this, Lansburgh's course of conduct is in itself the strongest affirmance of the defendant's position that Lansburgh, as well as McCormick, understood they were dealing at arm's length, with no obligation on the part of McCormick except that imposed by the order of the court to advance the expenses of the ejectment suits.

At the time of the tax sale there was no relation of cotenancy. McCormick had acquired in severalty 16,504 acres of the tract, and he was a mere lienholder as to the remainder. As the taxes had accrued before McCormick had acquired the tract of 16,504 acres he owed no duty to pay the taxes; on the contrary, the duty was on Lansburgh to pay them. There was nothing then in the legal relations of the parties that forbade McCormick to buy Lansburgh's interest at a tax sale. Summers v. Kanawha, 26 W. Va. 159; Holt v. King, 54 W. Va. 441, 47 S. E. 362; Towle v. Shelly, 19 Neb. 632, 28 N. W. 292; 37 Cyc. 1347. But even if there had been such relation, it was repudiated by Lansburgh.

[4, 5] The next inquiry is whether there was such failure to comply with the laws of West Virginia as made the tax sale invalid. In con-

sidering the grounds of attack, it should be borne in mind that the right to tax property, so essential to the very existence of government, can be enforced only by subjecting property to sale for nonpayment of taxes assessed against it. To hold tax sales invalid for slight and technical irregularities would therefore be to embarrass the state in the collection of its revenue. The sound view is that all requirements of the law leading up to tax sales, which are intended for the protection of the taxpayer against surprise and the sacrifice of his property, are to be regarded mandatory and to be strictly enforced. On the other hand, those provisions of the statute, designed merely for the guidance of the officer in order to secure the due and orderly conduct of the public business, concern the state only, and, as to the individual taxpayer, are to be regarded directory; and the courts will not in his behalf declare a tax sale void for failure by the officer to follow the strict letter of such provisions of law. Cooley on Taxation, 471; French v. Edwards, 80 U. S. 510, 20 L. Ed. 702; Gerke Brewing Company v. St. Clair, 46 W. Va. 93, 33 S. E. 122; Mosser v. Moore, 56 W. Va. 478, 49 S. E. 537. The statute of West Virginia provides:

"When the purchaser of any real estate so sold, and not redeemed as aforesaid, his assignee, or heirs or devisees, shall have obtained a deed therefor according to the provisions of this chapter and caused the same to be admitted to record in the office of the clerk of the county court of any county in which such real estate or any part thereof may be, such right, title and interest in and to said real estate, as was vested in the person or persons charged with the taxes thereon for which it was sold, at the commencement of, or at any time during the year or years for which said taxes were assessed, and all such right, title and interest therein of any other person or persons having title thereto, who have not in his or their own name been charged on the land books of the proper county or assessment district, with the taxes chargeable on such real estate for the year or years for the taxes of which the same was sold, and have actually paid the same as required by law, shall be transferred to and vested in the grantee in such deed, notwithstanding any irregularity in the proceedings under which the same was sold, not herein provided for, unless such irregularity appear on the face of such proceedings of record in the office of the clerk of the county court, and be such as materially to prejudice and mislead the owner of the real estate so sold, as to what portion of his real estate was so sold, and when and for what year or years it was sold, or the name of the purchaser thereof; and not then, unless it be clearly proved to the court or jury trying the case, that but for such irregularity the former owner of such real estate would have redeemed the same under the provisions of this chapter." West Virginia Code 1913, § 1084.

[6] It is a violation of constitutional right to make a tax deed conclusive evidence of the validity of the sale (Marx v. Hanthorn, 148 U. S. 172, 13 Sup. Ct. 508, 37 L. Ed. 410), but this statute does nothing more than make the deed prima facie evidence, with the additional provision that it shall be valid unless the irregularity was prejudicial, and that but for the irregularity the owner would have redeemed the land. This is another way of saying that technical irregularities, which produced no harm and interfered in no way with the redemption of the land by the owner, shall not make a tax sale invalid. We think there is no constitutional objection, founded in reason or authority, to such a provision of law. It facilitates the collection of the revenues of the state, and it imposes no unreasonable burden on the citizen, who is always charged with knowledge that taxes on his land are due to

the state, and that it will be sold in case of default. The statute was given full effect in Hamill v. Glover (W. Va.) 81 S. E. 970. The irregularities here alleged were: Insufficient advertisement of the sale; the designation of the location as Big Creek district instead of Sandy River district; designation of the owner as "Max Lausburg" instead of Max Lansburgh; inclusion in the number of acres mentioned of a portion of the tract lying in the state of Virginia. Such irregularities, occurring in the proceedings looking to the sale, are, under the case cited, unavailable to Lansburgh, because there is no proof that they were prejudicial, or that he would have paid the taxes or redeemed the land but for them. On the contrary, the evidence tends to show that he must have known the land was delinquent, and that he took no heed of the fact.

Similar irregularities in the assessment, it seems, do not fall under the statute; and as to these, strict compliance with the law is necessary to the validity of a tax sale. Male v. Moore, 70 W. Va. 448, 74 S. E. 685. It is alleged that the assessment was—

'null and void in that it was attempted to be made and purported to be upon the whole of your orator's land described as 44,350.5 acres, including the part thereof lying in the state of Virginia, as well as the portion thereof in said McDowell county, and was not apportionable, and in its description of the land attempted to be assessed the said assessment was fatally vague and indefinite, in that it described said land merely as 44,350.5 acres, Panther, Dry Fork and Bradshaw, in the Sandy River district."

If this defect were set up by another person interested in the land it might present a serious question under the authority of the case last cited. So also if the assessment or delinquent list had contained no description at all it would be held fatal even as against the owner. Mosser v. Moore, 56 W. Va. 478, 49 S. E. 537. But an inadequate description in the assessment proceedings, or the inclusion of a larger area than was proper, cannot avail one who was the owner at the time of the assessment and the time of the sale, for the reason that the assessor is required by law to obtain from the owner the description of the land. Code of West Virginia, § 898. The presumption therefore is that the description was furnished to the assessor by Lansburgh, and he cannot now allege that it was insufficient or incorrect after the rights of other persons have become involved. We conclude there is no illegality in the tax sale available to Lansburgh.

There would be no value in an analysis of the mass of testimony relating to the details of the sale by McCormick to Ritter. Careful consideration of all of it leads to these conclusions: McCormick, annoyed and vexed by the long and expensive litigation and the uncertainty as to the title, was very anxious to sell all his interest, and believed that he had acquired whatever title Lansburgh had. He also believed with good reason that Lansburgh had abandoned all claim to the land. Ritter, in proposing to purchase tried to get the best bargain he could, and had no other interest in the matter. The price of $60,000 was obviously inadequate for a clear title, but other persons were setting up claims, and McCormick accepted the low price in order to escape further trouble. The record furnishes no sufficient evidence of an intention to defraud Lansburgh by collusion between

McCormick and Ritter or otherwise. It is true McCormick conveyed only his interest, but the purchaser Ritter acquired every right, both legal and equitable, which McCormick had, and, as already indicated, McCormick had acquired all of Lansburgh's interest.

Importance was attached in the argument to the fact that Mr. D. L. Flournoy, who represented Lansburgh in his litigation with McCormick, and who died before this suit was brought, was one of the representatives of McCormick in negotiating the sale of Ritter. In the light of subsequent events it was unfortunate that Flournoy took this course without the express and direct statement of Lansburgh that he regarded his title lost; but careful scrutiny of the record leads to the clear conclusion that he believed, and had good reason to believe, that Lansburgh had abandoned all claim to the land when he failed to accept his advice and redeem it after the tax sale. For this reason his action leaves no shadow on his fair name.

In meeting the charge that Flournoy and his associates had betrayed the trust which as counsel they owed to Lansburgh, all communications written and oral between them and Lansburgh or his counsel in Washington were clearly admissible in their vindication. Hunt v. Blackburn, 128 U. S. 464, 9 Sup. Ct. 125, 32 L. Ed. 488; Grant v. Harris, 116 Va. 642, 82 S. E. 718. We conclude: First, that Lansburgh's interest passed under the judicial and tax sales; and, second, if he had any legal or equitable right afterwards, he lost it by his laches.

Affirmed.