**Ida Maxwell WELLS**

v.

**G. Gordon LIDDY**

**No. CIV JFM–97–946.**

United States District Court, D. Maryland.

March 19, 2001.

---

David M. Dorsen, Wallace, King, Mawaro & Branson, LLC, Washington, DC, Larry S. Greenberg, Bethesda, MD, for Ida Maxwell Wells.

Ty Cobb, Douglas R.M. Nazarian, Hogan & Hartson, Baltimore, MD, John B. Williams, Kerrie L. Hook, Michael R. Carithers, Jr., Mary C. Cronin, Collier Shannon Rill & Scott, Washington, DC, for G. Gordon Liddy.

Richard Murray, Murray Jacobs and Abel, Alexandria, VA, John B. Williams, Collier Shannon Rill & Scott, Washington, DC, for Phillip Mackin Bailley.

## MEMORANDUM

MOTZ, District Judge.

On February 1, 2001, I issued an oral opinion granting defendant's motion for judgment as a matter of law after the jury had announced it would be unable to render a verdict. Applying the standard set forth by Fed.R.Civ.P. 50(a),[1] I found that no "reasonable jury" could have found in favor of plaintiff Ida Maxwell Wells against defendant G. Gordon Liddy on the issue of whether Liddy had been negligent in making the allegedly defamatory remarks upon which Wells's suit was based.[2] On February 6, 2001, I entered an order implementing my oral opinion. In that order I indicated I might enter a supplemental written opinion in the event of an

---

1. In making this determination, I have viewed the evidence in the light most favorable to Wells, the non-moving party, and given her the benefit of all reasonable inferences. *See Herold v. Hajoca Corp.,* 864 F.2d 317, 319 (4th Cir.1988) (citations omitted).

2. With the consent of counsel, I submitted a special verdict form to the jury permitting it to select one of two questions to answer first: whether Wells had proved the falsity of the allegedly defamatory statements or whether she had proved that Liddy had acted negligently in making them. A unanimous "no" answer to either of the questions would have made consideration of the other question un-

necessary. In a post-trial interview with counsel and me, the jurors indicated they were split seven to two in favor of Liddy on both questions. Several of the jurors confirmed this vote in a separate interview or interviews newspaper reporters conducted of them.

I granted Liddy's motion for judgment as a matter of law solely on the negligence issue. On the truth/falsity issue, Wells's testimony denying that there were any pictures of prostitutes in her desk that were shown to visitors to the DNC headquarters is itself sufficient to create a jury question.

appeal. This memorandum constitutes that opinion. My discussion assumes a reader is knowledgeable about the facts and issues as set forth in the earlier published opinions in the case. *See Wells v. Liddy*, 186 F.3d 505 (4th Cir.1999), *rev'g* 1 F.Supp.2d 532 (D.Md.1998).

## I.

In its opinion on the prior appeal in this case, the Fourth Circuit held I erred in finding that Liddy was entitled to summary judgment on Wells's claims for presumed and punitive damages. The Fourth Circuit disagreed with my conclusion .that the record established that Wells would be unable to prove that Liddy acted with actual malice in making alleged defamatory statements about her on two occasions: once during a question and answer session after a motivational speech he made at James Madison University and again during a talk he gave while on a cruise ship. 186 F.3d at 544. I recognize that my granting of Liddy's motion for judgment as a matter of law might be seen to be at odds with the Fourth Circuit's ruling since I am finding that Wells's evidence fails to meet the lower standard of negligence the parties agree (in light of the Fourth Circuit's further holding that Wells is not an involuntary public figure) applies to her compensatory damage claim.[3] However, I am now ruling after the establishment of a trial record that is fuller and more clarifying than was the record on summary judgment.

The question posed by Liddy's motion for judgment is whether Wells presented sufficient evidence from which a reasonable jury could find that Liddy failed to take reasonable steps in assessing the truth of his allegedly false statements.

According to the Fourth Circuit, the portion of Liddy's remarks on which the case turns is his statement that there were pictures of prostitutes in Wells's desk that were shown to visitors to the DNC headquarters interested in call girl services. The sole source of this information was Phillip Bailley. The question thus becomes whether Liddy reasonably assessed the veracity of what Bailley told him about the pictures allegedly in Wells's desk.

Bailley has a history of mental illness, and. his personal involvement in prostitution activities around the time of the Watergate break-ins led to a felony conviction and his disbarment as a lawyer. Liddy was aware there were doubts about Bailley's credibility, and Liddy's own counsel had advised him not to rely exclusively upon Bailley. Thus, to borrow a phrase frequently used in instructions concerning the believability of felons, cooperators, accomplices, and the like in criminal cases, Liddy was required to examine Bailley's statements with caution and weigh them with great care. Liddy was not, however, required to discard those statements entirely, and for the following reasons I find that Wells failed to produce sufficient evidence at trial from which a jury could reasonably find that he acted negligently in giving credit to them.

I note at the outset that although the fact is certainly not dispositive, the evidence reveals that Liddy did not obtain the information from Bailley in a casual conversation. He spoke with Bailley in the presence of one Susan Fenley, a third party whose presence was requested by Bailley. At one point, according to notes that Liddy transcribed immediately after the interview, Fenley interrupted Bailley to say: "You are getting into very heavy

---

**3.** As I indicated in my oral opinion after trial, I continue to believe that Wells is an involuntary public figure. However, both in instructing the jury and in considering the sufficiency of the evidence, I have, of course, applied a negligence standard.

stuff, now. Are you on the record?" According to Liddy's notes, Bailley continued on, without paying heed to what Fenley had said.

The record is also clear that Liddy did not simply rely upon his own assessment of Bailley's credibility. A call girl theory of Watergate had emerged in the literature in 1984 when James Hougan had authored a book entitled *Secret Agenda*. In 1991, the same year in which Liddy conducted his interview of Bailley, another book, *Silent Coup*, written by Leonard Colodny, expanded upon the theory. From conversations with Hougan and Colodny, Liddy was aware that Bailley had given them essentially the same information that Bailley gave him about the contents of Wells's desk. Colodny did not testify at trial. Hougan, however, did appear as a witness, and his testimony dispelled any inference that he is a fanatical conspiracy theorist whose name Liddy simply has invoked to provide cover for his crediting of Bailley.[4] A former Washington editor for *Harper's*, Hougan brought to his study of Watergate a perspective far different from Liddy's. Further, as Liddy knew, Hougan's work had received favorable reviews from his peers, including J. Anthony Lukas, a Pulitzer Prize winning author. Thus, the record establishes that Liddy, in making his own assessment of Bailley's credibility, could responsibly rely upon Hougan's judgment that Bailley was telling the truth, just as any professional may rely upon the clinical judgment of another.

The record also establishes that Liddy tested what Bailley told him by independent investigation. He studied relevant literature and conducted interviews of his own. Before making the statements upon which Wells's claims are based, he also had the benefit of numerous depositions taken in an earlier defamation suit John and Maureen Dean had filed against him, St. Martin's Press, and others in the District of Columbia.[5] The materials available to Liddy reflected various facts that he could reasonably consider to be corroborative of what Bailley had said.[6]

First, Liddy knew that the evidence is overwhelming that Eugenio Martinez, one of the Watergate burglars, had a desk key in his possession (taped to a spiral notebook) on the night of the second break-in. Liddy also knew the evidence is undisput-

4. By suggesting that Hougan made a favorable impression at trial, I do not intend to invade the province of the fact-finders. Of course, it was entirely up to the jury to determine whether Hougan was telling.the truth about the matters to which he testified. However, the appearance Hougan projects is itself a relevant fact in determining whether Liddy could reasonably rely upon him, and to the extent that the cold record does not adequately portray that appearance, I am simply adding my own observation. In any event, the point is not critical to my decision.

5. This case had its origins in the *Dean* litigation. Wells's present counsel, who was then representing the Deans (but not her), attended the James Madison University event where Liddy was speaking and tape-recorded the allegedly defamatory remarks. He then transcribed those remarks and, apparently believ- ing that it was in the Deans's interest to have parallel litigation instituted against Liddy, had a copy of the transcript sent to Wells and encouraged her to sue.

The *Dean* suit has been concluded by an out-of-court resolution. However, as Liddy's trial testimony made clear, the acrimony between the Deans and himself remains. Therefore, since the Deans are not parties to the present case and since the aspects of Liddy's call girl theory implicating John Dean in the second Watergate break-in are tawdry and unnecessary to the resolution of the issues now presented, I will refrain from discussing them.

6. It is worth noting that there was evidence that Bailley made uncorroborated accusations implicating other persons in the call girl ring that Liddy did not repeat.

ed that the only lock at the DNC headquarters that the key fit was the lock to Wells's desk. In its prior opinion the Fourth Circuit indicated that this fact corroborated only the call girl theory in general, not what Bailley specifically said about the contents of Wells's desk. However, at that time the Fourth Circuit did not have the benefit of a complete trial record. While the placing of a tap on Spencer Oliver's telephone line that was accessible through an extension on Wells's desk may only support the call girl theory generally, the fact that one of the burglars had a key to the desk specifically ties the desk to that theory. Wells presented no evidence at trial concerning anything else she kept in her desk in which the Watergate burglars might have been interested, and she has suggested no alternative explanation as to why Martinez possessed the key.

Second, Liddy knew that Carl Shoffler, the same arresting officer who seized the key from Martinez, had testified on deposition in the *Dean* case that a camera placed by the burglars was found on Wells's desk.[7] This testimony tends to reflect that something of interest to the burglars was in or around Wells's desk.

Third, Liddy knew from various sources, including the deposition of Alfred Baldwin taken in the *Dean* case, that conversations of a sexual nature had been intercepted over Oliver's tapped telephone line.[8] While not specifically supporting Bailley's assertion that pictures of prostitutes were kept in Wells's desk, these conversations provide part of the context in which the credibility of that assertion must be judged.

Fourth, Liddy was aware that the conventional theory of the reason for the Watergate break-ins—to obtain political intelligence from a tap on the telephone of Larry O'Brien, the chairman of the DNC—has long been subject to question. The bugging equipment alleged to have been used required a line of sight between the tap and the interceptor; no line of sight existed between O'Brien's telephone and the Howard Johnson hotel room across the street from the DNC headquarters where the interceptor was located. Likewise, no tap was ever found on O'Brien's phone. Further, several experienced observers (including Charles Colson, who testified by videotape deposition at trial) have questioned the view that savvy political operatives would have expected to learn sensitive political information, as opposed to organizational and financial information, from a tap on telephones at the national headquarters of a major political party.

Fifth, Liddy knew of deposition testimony from the *Dean* case by Jack Rudy, who was the Assistant United States Attorney in charge of the grand jury investigation of prostitution resulting in Bailley's indictment. Rudy had testified that one of his informants, the alleged madam of a call girl ring being run at the Columbia Plaza apartment complex near the Watergate, "mentioned Spencer Oliver [to Rudy] in the sense that [Oliver] knew of or had been involved in some way in the Columbia Plaza operation." Moreover, according to Rudy, "one of the FBI agents identified one of the coded names [in an address book seized from Bailley] as being a person who worked either at or with the DNC." When asked what that person did at or with the DNC, Rudy answered, "I'm

7. Shoffler is deceased, and his testimony at trial was presented by videotape deposition.

8. Baldwin was the person who listened to, and kept a log of, the illegally intercepted conversations.

stretching to say that she was a secretary or administrative aide of some type. Administrative aide is what I want to say, but I don't believe she came up to doing that. That would imply she was a higher person. I think she was more of a—like an executive secretary or something." Further, Rudy testified, "[i]t seems to me that . . . this was a female who arranged for liaisons. It was kind of a go-between." Of course, this testimony constituted hearsay, and it was not admissible on the truth/falsity issue. However, it was admissible concerning Liddy's state of mind and provided corroboration for what he had been told by Bailley.

Sixth, Wells testified she cannot recall having known Bailley. However, Liddy knew that Bailley's sister, Jeanine Bailley Ball, testified on deposition in the *Dean* case (as she did at trial) that while she was a teenager, she worked as a secretary in her brother's law office and that a woman identifying herself as Maxie Wells called in on numerous occasions asking to speak to Phillip Bailley. Wells attacks Ball's credibility on this point. Perhaps her attack is well founded, perhaps it is not. However, nothing in the record demonstrates that Ball is so inherently unreliable that Liddy was unreasonable in crediting what she said. Her testimony provided a basis for him to conclude that Wells has not been forthcoming about her relationship with Bailley.

Seventh, Officer Shoffler was present on the day shortly after the second break-in when Wells learned that a piece of photographic equipment had been found on her desk. According to his deposition testimony in the *Dean* case, Wells "made a surprise sort of—I characterize it as a shocked look and [said] something to the

effect of, 'My God, they haven't gone in there,' or something to that effect." Further, Shoffler recalled that the person standing behind Wells (whom he later was led to believe was Spencer Oliver) "was more calm" and "was very emphatic in terms of how he looked at her, [saying] 'Well, there's nothing in there of any importance anyway.'"

Eighth, Wells produced in discovery in this case a letter she wrote (but never sent) to one of her close friends immediately after it was publicly disclosed that Oliver's phone had been tapped.[9] Liddy learned of the letter after he had made his speech at James Madison University but before making his remarks on the cruise ship. Thus, it is relevant to his state of mind when he made the second of his allegedly defamatory statements. Wells began her letter by referring to another note she was enclosing:

> I haven't gotten around to mailing this yet; it's just as well because I've developed a crisis since then. I was subpoenoed (sp?) on Saturday to appear before the Grand Jury in Washington on Wednesday. I'm flying up tomorrow to talk to Spencer & the DNC lawyers, plus to get one of my own maybe.

She continued:

> It appears that the Republicans are going to try to discredit Demo. witnesses on moral grounds. They've got the makings for a good scandal in my case because I've lived with those guys, Joe, etc.—and they apparently know a lot of it. Spencer & I both feel (hope, really) that I probably won't be important enough for them to bother, but I am really upset & nervous & will really be glad when it's all over. The FBI has a

9. According to a proffer made by defense counsel, this letter was contained in a box of Watergate-related materials turned over by

Wells that, when deposed, Wells stated she had not looked into for twenty-five years.

file on me a mile long now, which isn't any big deal, & I may have to bare (or bear) all in court, which also isn't so terrible—but I am really afraid the press will take off & run with all of this when they smell gossip. The other records will be private, & I don't think I've broken any laws, but you can understand my nerves.

She added, "I doubt seriously if anyone at the house will mention the W'gate incident to me, but please squelch *any* discussion of it at all & say things are fine. Also better get rid of this; I shouldn't write, but must confide in someone." Wells closed the letter by referring to herself as a friend "who needs help keeping her nose clean."

On deposition and at trial Wells testified that all she was alluding to in this letter was the fact that she lived in a house with five male acquaintances (in a room off by itself) and that she had been involved in conversations over the tapped telephone line during which she gossiped about the personal lives of other persons at the DNC. Nothing in the letter necessarily contradicts this explanation. However, a reasonable person would not necessarily find the explanation satisfactory, and might conclude instead that the letter reflected that Wells had been engaged in questionable activities.

In sum, the record is replete with facts that Liddy could reasonably believe support Bailley's statements about the contents of Wells's desk. This is not to say, of course, that what Bailley said was true or that the call girl theory is accurate. That is not the question. The dispositive point is that Wells had the burden of proving that Liddy lacked a reasonable basis for expressing the allegedly defamatory

remarks about her, and the evidence was insufficient to sustain that burden.

## II.

One can certainly sympathize with Wells's plight of being caught up in the resurrection of events that occurred decades ago and over which she may never have possessed control. However, for the reasons I have stated, she has not met her burden of proof on the negligence issue. Moreover, her claims raise serious First Amendment concerns. Her avowed purpose in pursuing the litigation (as expressed during her trial testimony) is to prevent any further public discussion about facts connecting her desk and the telephone on the desk to the motives of the Watergate burglars.

The conventional "political intelligence" theory of the Watergate break-ins, first articulated by the majority report of the Senate Select Committee investigating the Watergate affair, may be correct. The call girl theory, or some part of it, may be correct instead. Alternatively, there may be truth in neither theory, or in both. Different participants and their principals may have had different motives, some to obtain political intelligence, others to garner information with which to embarrass or compromise their political opponents. But whatever the truth may be, one thing should be certain: free debate about important public issues must be tolerated, provided that the debate (when it potentially damages the reputations of private persons) does not exceed the bounds of reason.

In the wake of the mistrial in this case,[10] an editorial in a respected newspaper opined, "Courts are a capricious venue for

10. As noted in footnote 2, *supra,* seven of the nine persons representing the common sense of the community, after hearing all of the evidence, did not find Liddy's statements to have been proven false. That fact alone highlights the constitutional cost of subjecting Liddy to the time and expense of a second trial.

arguments about history.... [C]onspiracy theorizing generally is better addressed in the public arena by rigorous confrontation with facts." These observations certainly may be true. But the editorial did not stop there. Decrying the views of the jurors who were prepared to find in favor of Liddy and their conclusion that Wells had failed to prove his theory wrong, the editorial went on to say:

> The call girl theory "is possible," one juror ... [said]. "It sure makes me curious." "We'll never know" what happened, said another. The danger of such outcomes as this one is that this sort of thinking spreads. For whether or not Mr. Liddy's comments legally defamed Ms. Wells, we do know what happened at Watergate—and it had nothing to do with prostitutes.

Apparently, in the editorialist's view, the book on Watergate has been forever closed. But spreading "this sort of thinking"—fresh, inquisitive, and demanding of proof—is precisely what the First Amendment is all about. Individually and as a people, in order to prevent our minds from narrowing, we must be wary of ourselves, subjecting our own premises, spoken or unspoken, to critical self-scrutiny. We must be equally skeptical about pronouncements of allegedly unalterable truths asserted by those who proclaim exclusive knowledge. We must remain open to reasonable discussion, challenging our own ideas and those of others. No one familiar with the record in this case would pretend that it has brought finality to what assuredly will be a continuing debate about the reasons for the Watergate break-ins. As the jurors criticized in the editorial recognized, the trial raised far more questions than it answered. It is the pursuit of those questions, however, that the First Amendment protects. To make that pro-

tection real, this litigation must come to an end.