UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

IDA MAXWELL WELLS,
          *Plaintiff-Appellant,*

v.

G. GORDON LIDDY,
          *Defendant-Appellee.*

PHILLIP MACKIN BAILLEY,
          *Movant.*

No. 01-1266

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-97-946-JFM)

Argued: October 29, 2001

Decided: March 1, 2002

Before WILKINS, WILLIAMS, and MICHAEL, Circuit Judges.

Affirmed in part, reversed in part, and remanded for further proceedings by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** David M. Dorsen, WALLACE, KING, MARRARO &
BRANSON, P.L.L.C., Washington, D.C., for Appellant. John
Buchannan Williams, COLLIER, SHANNON, SCOTT, P.L.L.C.,
Washington, D.C., for Appellee. **ON BRIEF:** Kerrie L. Hook, COL-
LIER, SHANNON, SCOTT, P.L.L.C., Washington, D.C.; Douglas

R.M. Nazarian, HOGAN & HARTSON, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

This defamation case, filed by Ida Maxwell "Maxie" Wells against G. Gordon Liddy, reaches this court for the second time. Wells's defamation claims are based on statements Liddy made alleging that Wells was involved with a call-girl ring while working as a secretary at the Democratic National Committee (DNC) in 1972. The district court initially granted Liddy's motion for summary judgment, concluding that Wells, an involuntary public figure, could not prove that Liddy acted with actual malice. Wells appealed and this court held that under the evidence presented, a rational trier of fact could conclude that Liddy acted with actual malice. *See Wells v. Liddy*, 186 F.3d 505, 542-44 (4th Cir. 1999). This court further held that Wells was a private individual, and therefore, that while a showing of actual malice was required to recover punitive and presumed damages, she needed only to prove that Liddy was negligent in making the statements to recover compensatory damages. On remand the district court held a trial, but the jury was unable to render a verdict. Based upon the trial record, the district court granted Liddy's renewed motion for judgment as a matter of law, holding that no reasonable jury could find that Liddy was negligent in making the allegedly false statements. Because we determine that the evidence does not preclude Wells from proving that Liddy failed to take reasonable steps in assessing the veracity of his statements, we reverse the district court's grant of judgment as a matter of law and remand for further proceedings consistent with this opinion.

## I.

Recognizing the importance of the historical background in this case, we begin by briefly recounting the chronology of events that underlie the present dispute.[1] From February of 1972 until July of 1972, Wells was employed at the DNC offices in Washington, D.C., located at that time in the Watergate complex. Wells worked as the secretary to Spencer Oliver, Executive Director of the Association of State Democratic Chairmen.

In the early morning hours of June 17, 1972, Frank Wills, a security guard, summoned the police because a door at the Watergate had been suspiciously taped so that it would not lock. Upon their arrival, the police arrested five men, and the inquiry into the now infamous Watergate break-in began. The initial focus of the investigation targeted the five would-be burglars and two of their co-conspirators, namely E. Howard Hunt, then White House aide, and Liddy, then counsel for the Committee to Reelect the President. All seven were indicted by a federal grand jury on September 15, 1972. Liddy was charged with multiple counts of burglary, conspiracy, and interception of wire and oral communications. Liddy, refusing to plead guilty or cooperate with the prosecution, was tried, convicted, and served fifty-two months in prison.

James McCord, one of the five burglars, pled guilty to a variety of burglary, conspiracy, and wiretapping charges but then claimed that he was pressured to plead guilty and lie during the district court proceedings. McCord's allegations implicated high-level administration officials. As subsequent investigations unfolded, the White House's effort to cover up its involvement led to the imprisonment of several high-ranking White House officials and ultimately to the resignation of President Richard M. Nixon in August of 1974.

Since his release in 1977, Liddy has engaged in public commentary through a successful radio talk show, an autobiography, and as a frequent speaker on the lecture circuit. During several public appearances, Liddy presented an alternative theory behind the Watergate

---

[1]These past events that are more completely recounted in our earlier opinion. *See Wells v. Liddy*, 186 F.3d 505, 513-518 (4th Cir. 1999).

break-in.[2] This alternative theory, which is described in a 1991 book by Len Colodny and Robert Gettlin titled *Silent Coup: The Removal of a President*, alleges that John Dean had personally ordered the Watergate break-in to protect his own reputation and the reputation of his now-wife Maureen Biner. Len Colodny & Robert Gettlin, *Silent Coup: The Removal of a President*, 131-33, 147-48 (1991).

Biner was allegedly a close friend of Erica L. "Heidi" Rikan, who operated a call-girl operation at the Columbia Plaza apartments, near the Watergate complex. The *Silent Coup* theory of the break-in asserts that Phillip Mackin Bailley, an attorney, used his connections with the DNC to promote Rikan's prostitution ring. According to Colodny and Gettlin, when Oliver was not in the office, his phone, which was the target of the first Watergate break-in, was used to arrange meetings between visitors to the DNC and Rikan's call girls. Bailley was arrested and indicted for various crimes, including violations of the Mann Act, and as a result, his address books were seized.

According to *Silent Coup*, Dean, upon hearing of Bailley's arrest, called the Assistant United States Attorney investigating the case and summoned him to the White House. During this meeting, Dean supposedly stated that he thought the Democrats had leaked the story about the prostitution ring. Dean photocopied Bailley's address book to compare it with a list of White House Staff. Biner's name, as well as an alias of her good friend Rikan, were found in Bailley's address book.

The implication, therefore, is that Dean ordered the second and ill-fated Watergate break-in to determine whether the Democrats had information linking Biner to the Bailley/Rikan call-girl ring and, if they did, whether they intended to use that information to embarrass him and the White House. The authors of *Silent Coup*, noting that one of the Watergate burglars was found to be carrying a key to Wells's desk, prompt its readers to contemplate the following unanswered question: "*Why* would a Watergate burglar have a key to Wells's desk

---

[2]The conventional theory is that the motive behind the Watergate break-in was to replace a malfunctioning listening device that had been installed in an earlier break-in at the DNC. *See*, *e.g.* Karlyn Barker & Walter Pincus, *Watergate Revisited*, Wash. Post, June 14, 1992, at A1.

in his possession, and what items of possible interest to a Watergate burglar were maintained in Wells's locked desk drawer?" Colodny & Gettlin, *supra*, at 159 (emphasis in original).

Beginning in 1988, Liddy had extensive conversations with Colodny regarding the *Silent Coup* theory, and by 1991, Liddy had reached the conclusion that the theory was valid. As a result, in 1991, Liddy endorsed the theory in a special paperback edition of his autobiography titled *Will*. On June 3, 1991, Liddy met with Bailley to discuss Bailley's involvement with the Rikan prostitution ring. During that meeting Bailley described to Liddy how the DNC procured prostitution services for some of its visitors. According to Bailley, photographs of Rikan's call girls were kept in a desk in the Oliver/Wells/Governors area and various personnel at the DNC would display the photographs to DNC visitors and would then arrange meetings with the visitor's call girl of choice. Bailley also stated that DNC employees were paid a commission on their referrals. Liddy began routinely to incorporate the *Silent Coup* theory of the Watergate break-in, including his discussion with Bailley, into his public speeches. This case on appeal concerns two occasions on which Liddy espoused the *Silent Coup* theory. First, on April 2, 1996, Liddy delivered a speech at James Madison University in Harrisonburg, Virginia (the JMU speech). During the JMU speech, Liddy, in response to a question, made the following statement:

> [S]ome members of the DNC were using the call girl ring as an asset to entertain visiting firemen. And to that end they had a manila envelope that you could open or close by wrapping a string around a wafer. And in that envelope were twelve photographs of an assortment of these girls and then one group photograph of them. And what you see is what you get. It was kept, he said, in that desk of Ida Maxine Wells. Thus, the camera [and] all the rest of it. And what they were doing is as these people would be looking at the brochure, if you want to call it that, and making the telephone call to arrange the assignation that was being wiretapped, recorded and photographed.

(J.A. at 53-54.) Second, Liddy gave a similar speech while on a Mediterranean cruise (the cruise ship speech) in August 1997.

## II.

On April 1, 1997, Wells filed a defamation action against Liddy, asserting that Liddy defamed her by stating on several occasions that she acted as a procurer of prostitutes for men who visited the DNC.[3] The complaint sought one million dollars for injury to reputation and standing in the community, one million dollars for mental suffering, humiliation, and embarrassment, and three million dollars in punitive damages. Liddy filed an Answer and Affirmative Defenses on April 28, 1997.

Following discovery, Liddy filed a motion for summary judgment, which the district court granted in Liddy's favor on April 13, 1998. *See Wells v. Liddy*, 1 F. Supp. 2d 532 (D. Md. 1998). This court reversed the district court's grant of summary judgment and remanded the case for trial. *See Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999). Specifically, we determined that Virginia law, rather than Louisiana law, applied to the allegations surrounding Liddy's JMU speech, and maritime law applied to the cruise ship speech.[4] *See id.* at 522, 524. Moreover, we held that the cruise ship speech, in addition to the JMU speech, was capable of conveying a defamatory meaning. *See id.* at 523 & 527. On the claims regarding the Don & Mike show and the Accuracy in Media web site, this court affirmed the district court's application of Louisiana law and its conclusion that neither is capable of having a defamatory meaning. *See id.* at 527-30. This court then determined that Wells is a private individual, not an involuntary public figure, and therefore need not prove actual malice to recover

---

[3]Initially, in addition to the JMU speech and the cruise ship speech, Wells alleged that Liddy made defamatory statements that were quoted on the Accuracy in Media web site, broadcast on the Don & Mike radio show, and broadcast on the Hardball television show. The defamation claims based on the statements made on the Don & Mike show and appearing in the Accuracy in Media web site were dismissed by the district court on summary judgment and we affirmed. *See Wells*, 186 F.3d 527-31. Wells voluntarily dismissed the Hardball claim prior to the district court's summary judgment ruling. *See Wells v. Liddy*, 1 F. Supp. 2d 532, 534 n.1 (D. Md. 1998).

[4]The parties, however, have since stipulated to the application of Virginia law to both of Liddy's statements.

compensatory damages. *See id.* at 531-542. Moreover, concerning Wells's claim that Liddy acted with actual malice, which must be proven to recover punitive and presumed damages, this court determined that Wells had raised a genuine issue of material fact. *See id.* at 542-44.

Upon remand, a jury trial commenced on January 16, 2001. The jury, however, failed to render a verdict. The district court excused the jury and entered an order granting Liddy's renewed motion for judgment as a matter of law on February 6, 2001. *See Wells v. Liddy*, 135 F. Supp. 2d 668 (D. Md. 2001). Specifically, the district court held that "no 'reasonable jury' could have found in favor of plaintiff Ida Maxwell Wells against defendant G. Gordon Liddy on the issue of whether Liddy had been negligent in making the allegedly defamatory remarks upon which Wells's suit was based." *See id.* at 669.

Wells again appeals to this court, alleging that (1) the district court erred in entering judgment as a matter of law on the issue of Liddy's negligence; (2) the district court erred in making numerous evidentiary rulings; (3) the district court erred in ruling that Liddy did not waive attorney-client and work-product privileges; and (4) the district court erred in denying Wells's unopposed motion to file her second amended complaint. We will review each challenge in turn.

### III.

We review the district court's entry of judgment as a matter of law de novo. *See United States v. Vanhorn*, 20 F.3d 104, 109 (4th Cir. 1994). Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue . . . ." Fed. R. Civ. Pro. 50(a)(1). In other words, we must determine "whether, without weighing the evidence or considering the credibility of witnesses, there can be but one conclusion as to the verdict that reasonable jurors could have reached." *Vanhorn*, 20 F.3d at 109 (internal quotation marks omitted). Moreover, when making our determination, we must view the evidence, and make all reasonable inferences to be drawn therefrom, in favor of the nonmoving party. *See Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir. 1996) ("While our review of this motion is plenary, it is also circumscribed

because we must review the evidence in the light most favorable to [the nonmoving party].") (quoting *Singer v. Dungan*, 45 F.3d 823, 827 (4th Cir. 1995)). We are also obligated to apply the "substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Under Virginia law, to recover actual or compensatory damages in a defamation action Wells, a private individual, must establish by a preponderance of the evidence that Liddy was at least negligent in making each statement, that is, that he "either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." *See Gazette, Inc. v. Harris*, 325 S.E.2d 713, 725 (Va. 1985).[5] Therefore, to survive Liddy's motion for judgment as a matter of law, there must be sufficient evidence for a reasonable jury to find, by a preponderance of the evidence, that Liddy either knew that he was making a false statement, or that he lacked reasonable grounds for believing his statements were true or acted negligently in failing to ascertain the facts upon which his statements were based. Because we find that sufficient evidence exists, we reverse the district court's judgment as a matter of law.

As we noted during the first appeal, Bailley's statements are clearly the only direct evidence that Wells personally had a role in the alleged prostitution-related activities conducted out of the DNC. *See Wells*, 186 F.3d at 542-44. It is also well established in the record that Bailley is an unreliable source. *See id*. at 542 ("Bailley, who is a disbarred attorney and convicted felon with a long history of substance abuse and mental illness, had changed his story about the prostitution ring several times and was not a reliable source."). The issue, therefore, as the district court points out, is "whether Liddy reasonably assessed the veracity of what Bailley told him about the pictures allegedly in Wells's desk." *Wells v. Liddy*, 135 F. Supp. 2d 668, 670 (D. Md. 2001) ("Liddy was required to examine Bailley's statements with caution and weigh them with great care.").

---

[5]Recovery of presumed or punitive damages for defamation under Virginia law requires a finding of actual malice, that is, clear and convincing evidence that Liddy made the statements with "knowledge of [their] falsity or reckless disregard for the truth." *Gazette, Inc.*, 325 S.E.2d at 724.

The district court concluded that Wells had not produced sufficient evidence to establish that Liddy failed to fulfill his obligation to assess the veracity of Bailley's statements. *See id.* Determining that Liddy was aware of facts that reasonably corroborated what Bailley had said, the district court concluded that Liddy had tested Bailley's statements sufficiently by independent investigation. *See id.* at 671. Specifically, the district court determined that the following evidence, all known to Liddy, sufficiently corroborated Bailley's statements about Wells's involvement in call-girl activities, preventing Wells from meeting her burden of proof: (1) Eugenio Martinez, a Watergate burglar, was apprehended with a key to Wells's desk and at trial Wells provided no other explanation for why the burglars would target her desk; (2) Carl Shoffler, an arresting officer, testified in another case that one of the burglars' cameras was found on Wells's desk; (3) conversations of a sexual nature had been intercepted by the tap on Oliver's phone; (4) the conventional theory explaining the reasons for the Watergate break-ins long has been subject to question because of the type of equipment used and the ineffectiveness of such an operation; (5) deposition testimony from another case stating that an informant implicated Oliver in the call-girl ring and one of the FBI Agents identified a coded name in Bailley's address book as a secretary or administrative aide in the DNC office; (6) Bailley's sister said that Wells had a relationship with Bailley; (7) Officer Shoffler stated that Wells, acting as if she were very surprised and shocked to learn that the burglars placed photography equipment on her desk, exclaimed, "My God, they haven't gone in there"; and (8) Wells wrote a contemporaneous letter to a close personal friend that could be read as implicating her in "questionable activities."[6] *See id.* at 671-74.

These eight pieces of corroborating evidence are very similar to the following seven pieces of corroborating evidence upon which the district court based its original grant of summary judgment:

---

[6]The district court also noted that a third party was present at Liddy's interview of Bailley, demonstrating that Liddy and Bailley were not engaged in casual conversation, and that Liddy relied on the judgment of a well-known author, James Hougan, who also determined that Bailley was telling the truth. *See Wells*, 135 F.Supp. at 670-71.

(1) although Bailley changed his story several times, he consistently stated that a DNC secretary was involved in the call-girl ring; (2) in 1976 public reports circulated that intimate phone calls were occurring on DNC phones that led to unconfirmed rumors that the phones were being used in a call-girl ring; (3) the FBI found a tap on Oliver's phone; (4) Martinez possessed a key to Wells's desk; (5) it is entirely unclear why anyone would want to break into Wells's desk; (6) Bailley's sister said that Wells had a relationship with Bailley; and (7) there were rumors circulating among DNC staffers after the Watergate break-in regarding a call-girl ring.

*Wells*, 186 F.3d at 542. As we noted in the first appeal, this evidence tends to corroborate the call-girl theory generally, but it fails specifically to corroborate Bailley's statements concerning Wells's personal participation in the call-girl ring. In other words, the eight pieces of evidence listed above would not prevent a reasonable jury from inferring that Liddy's sole source of information on Wells's personal involvement in procuring prostitutes for visitors to the DNC was Bailley, who Liddy admits is not a credible source.[7] *See id.* at 543. A reasonable jury could conclude further that sole reliance on such an unreliable source violates Virginia's negligence standard, because it suggests that Liddy lacked reasonable grounds to believe that his statements were true.[8] *See Ingles v. Dively*, 435 S.E.2d 641, 645 (Va. 1993) (citing *Gazette, Inc.*, 325 S.E.2d at 724-25).

We conclude that the evidence enumerated by the district court

---

[7] Likewise, that Liddy obtained the information from Bailley in a formal interview and that Hougan also relied on Bailley do not corroborate Wells's alleged role. *See Wells*, 135 F.Supp. at 670-71.

[8] Indeed, we have already held that sole reliance on such an unreliable source creates a genuine issue of material fact with regard to the higher standard, that is, whether Liddy acted with actual malice. *See Wells*, 186 F.3d at 544 ("The inference that Bailley was Liddy's only source directly connecting Wells to prostitution activity combined with Liddy's acknowledgment that he knew Bailley was not reliable is sufficient to create a genuine issue of material fact regarding whether Liddy acted with actual malice.").

does not support judgment as a matter of law because it fails to prove, as a matter of law, that Liddy's actions were prudent. In other words, the question of whether Liddy was negligent presents a genuine issue of material fact for a jury to resolve and, therefore, the district court erred in granting judgment as a matter of law in Liddy's favor. Consequently, we reverse the district court's judgment and remand for a new trial.

## IV.

Although we have determined that remand is appropriate, in light of the protracted litigation in this case, the likelihood that many of the same issues will be revisited on remand, and the potential need for further discovery, we review the remaining three contentions Wells makes on appeal. With regard to Wells's challenges to the district court's evidentiary rulings, while a majority are unfounded and do not warrant further discussion,[9] two are meritorious and will be reviewed

---

[9]Wells divides her assignments of error regarding evidentiary rulings into four categories. Our general analysis of the merit of each category is as follows. First, the district court carefully explained various considerations weighing against the introduction of evidence probative to Liddy's state of mind and was within its discretion when it excluded or placed reasonable limits on the introduction of such evidence. *Cf.*, *e.g.*, *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1385 (4th Cir. 1995) (describing the district court's discretion to exclude evidence of notice under Rule 403 and instruct the jury regarding such evidence). Second, the district court did not abuse its discretion by admitting testimony on the call-girl theory. This evidence was probative of Liddy's state of mind when he made the JMU and cruise ship speeches. Moreover, because state-of-mind evidence is not introduced to prove the truth of its content, the best evidence rule does not apply. *See* Weinstein's Federal Evidence § 1002.05[1] (2d ed. 2001) ("The rule is inapplicable when content is not at issue."). Third, the district court properly admitted evidence on the issue of truth-falsity. Evidence that a prostitution ring was operating at the Columbia Plaza is only one piece of circumstantial evidence that Liddy presents in an attempt to draw the conclusion that Wells was connected with the prostitution ring. It is a well-settled principle that "circumstantial evidence is no less probative than direct evidence." *Stamper v. Muncie*, 944 F.2d 170, 174 (4th Cir. 1991) ("[C]ircumstances altogether inconclusive, if separately considered, may, by their number and

briefly below. We review the district court's decision to admit or exclude evidence under the narrow abuse of discretion standard. *See United States v. Hassouneh*, 199 F.3d 175, 182 (4th Cir. 2000).

A.

Wells argues that the district court erred by excluding evidence tending to show that Liddy's reliance on the publication of *Silent Coup* was disingenuous. Specifically, Wells sought to introduce disposition testimony by Roy Gainsburg, president of St. Martin's Press and Thomas McCormack, chairman of the board of St. Martin's Press. Gainsburg testified that if St. Martin's Press had knowledge that a book contained an important untrue statement of fact that would be damaging to someone, the book would not be publishable. He also stated, however, that in his view, St. Martin's Press did not have an "obligation to insure that the facts in every book that it published were true." (Exh. at 184-85.) Both Gainsburg and McCormack testified to having no knowledge of Bailley's mental condition. Wells claims that from this evidence, which Liddy had in his possession when he made the statements at issue, a jury could conclude that Liddy's reliance on the book was unreasonable. We agree.

Liddy's knowledge that the publisher of *Silent Coup* disavowed all responsibility for verifying the accuracy of the book and had no knowledge of Bailley's mental condition is relevant to Liddy's state of mind when he relied on the book in making his allegedly defama-

---

joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." (internal quotations omitted)). Fourth, the district court properly admitted into evidence the letter Wells wrote to a close friend on September 13, 1972, just prior to her appearance before the grand jury that indicted Liddy. In this letter, written at the time Wells was working at the DNC, she expresses concerns about being implicated in immoral and possibly illegal activities. Liddy's statements concerned Wells's involvement in an illegal prostitution ring while working at the DNC office. Therefore, the district court did not abuse its discretion by admitting this letter as evidence of Liddy's state of mind when he made the cruise ship speech. Liddy found out about the letter after he made the JMU speech but before he made the cruise ship speech. *See Wells*, 135 F. Supp. 2d at 673.

tory statements. Choosing simply to ignore such evidence might, along with other facts, suggest negligence or actual malice. The district court, in excluding the evidence under Federal Rule of Evidence 401, concluded that it "doesn't prove anything." (J.A. at 3123). Because the district court's basis for excluding the deposition testimony of Gainsburg and McCormack was legally incorrect, we find that it abused its discretion.

## B.

Wells also challenges two portions of Jeannine Bailley Ball's testimony, which were admitted for their relevance on the issue of truthfalsity in addition to the issue of Liddy's state of mind. In 1972, Ball was serving as a secretary to her brother, Phillip Bailley. She testified that early in 1972, someone identifying herself as Maxie Wells called Bailley and that Wells's name appeared in her brother's address book, which served as a record of his calls. Wells argues that admission of this evidence violates Federal Rule of Evidence 901(a), contending that self-identification is not enough to authenticate the call. We agree.

Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). The burden to authenticate evidence under Rule 901 is not a high one. *See* Weinstein's Federal Evidence § 901.02[3] (2d ed. 2001) ("Generally speaking, the proponent of a proffered exhibit needs only to make a prima facie showing that the exhibit is what the proponent claims it to be."). Once this requisite prima facie showing has been met, if the evidence satisfies all other rules of admissibility, the "[r]esolution of whether evidence is authentic calls for a factual determination by the jury."[10] *See United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992);

---

[10]The district court properly defined the jury's role in judging authentication by explaining to the jury that it must determine whether callers who identified themselves were telling the truth about who they were. The district court must, however, determine whether there is sufficient evidence for a reasonable juror to find in favor of authenticity before submitting this issue to the jury.

Weinstein's Federal Evidence § 901.02[3] (2d ed. 2001) ("[I]ssues the opponent has raised about flaws in the authentication . . . go to the weight of the evidence instead of its admissibility."). Before the evidence is admitted for consideration by the jury, however, "the district court must determine whether its proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." *Branch*, 970 F.2d at 1370.

Rule 901(b), as an illustration, explains that "[t]elephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if . . . in the case of a person, circumstances, including self-identification, show the person answering to be the one called" may be considered identified or authenticated. Fed. R. Evid. 901(b)(6). From this illustration, it is clear "that the mere announcement of identity *by a person who has placed a telephone call* does not suffice to make it admissible against the person so identified." *See United States v. Benjamin*, 328 F.2d 854, 864 n.3 (2d Cir. 1964) (citing 7 Wigmore, Evidence 617 (3d ed. 1940) (emphasis in original)). Instead, Rule 901 requires evidence to support the claim that the self-identifying caller is indeed who he says he is. For example, "telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him." *See* Fed. R. Evid. 901 advisory committee notes ex. (4). In other words, "the content of the conversation combined with the caller's self-identification" can sufficiently support a finding that the caller is who she says she is. *United States v. Console*, 13 F.3d 641, 661 (3d Cir. 1993). Because the caller identifying herself as Wells provided no other information that could verify her identity, the testimony lacks sufficient evidence for a reasonable juror to find in favor of authenticity or identification. The district court, therefore, abused its discretion by admitting this portion of Ball's testimony on the issue of truth-falsity.

V.

Wells next contends that the district court erred by ruling that Liddy had not waived his attorney-client and work-product privileges. Wells argues that Liddy waived his attorney-client privilege by dis-

closing confidential communications and that he waived the work-product privilege by making testimonial use of work product.[11]

The district court, while acknowledging that Liddy had disclosed confidential communications and made testimonial use of work-product, determined that Liddy's actions did not constitute a "classic waiver." (J.A. at 490-91.) Because Liddy's "affirmative use" of privileged material did not constitute a classic waiver, the district court reasoned, discovery of privileged material was limited to items that Liddy saw and relied upon to demonstrate his state of mind. (J.A. at 489-93; *id.* at 491 ("Anything factual communicated to Mr. Liddy has to be disclosed.").) We review the district court's application of the law of privilege de novo. *See Hawkins v. Stables*, 148 F.3d 379, 382 (4th Cir. 1998).

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). By protecting confidential communications between attorneys and their clients, the attorney-client privilege "encourage[s] full and frank communication . . . and thereby promote[s] broader public interests in the observance of law and administration of justice." *Id.* The attorney-client privilege, however, is not absolute. *See Hawkins*, 148 F.3d at 384 n.4.

Under Virginia law,[12] the attorney-client "privilege may be expressly waived by the client, or a waiver may be implied from the client's conduct." *Commonwealth v. Edwards*, 370 S.E.2d 296, 301 (Va. 1988) (citing *Grant v. Harris*, 82 S.E. 718 (Va. 1914)). When

---

[11]We previously reviewed and affirmed the district court's denial of Wells's June 25, 1997 Motion to Compel. *See Wells*, 186 F.3d at 518 n.12. That motion was based on Liddy's alleged failure to produce a privilege log and therefore law of the case does not apply to the issue now before us: whether Liddy waived the attorney-client and work-product privileges through disclosure.

[12]The Federal Rules of Evidence provide that "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law." Fed. R. Evid. 501.

"deciding whether the privilege has been waived by implication regard must be had to the double elements that are predicated in every waiver, i.e., not only the element of implied intention, but also the element of fairness and constancy." *Id.* (internal quotation omitted).

> There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final.

*Id.* (internal quotation omitted). Consequently, when disclosure to a third party waives the privilege, the waiver applies "'not only to the transmitted data but also as to the details underlying that information.'" *Id.* (citing *United States v. Cote*, 456 F.2d 142, 145 (8th Cir. 1972)). In other words, "[a] client's . . . testimony as to a *part of any communication* to the attorney is a waiver as to the whole of that communication, on the analogy of the principle of completeness." *Id.* (internal quotation omitted). The Supreme Court of Virginia has provided the following guidance for determining what constitutes the "underlying details" of a communication:

> "The details underlying the published data are the communications relating the data, the document, if any, to be published containing the data, all preliminary drafts of the document, and any attorney's notes containing material necessary to the preparation of the [communication]. Copies of other documents, the contents of which were necessary to the preparation of the [communication], will also lose the privilege."

*Id.* (quoting *United States v. (Under Seal)*, 748 F.2d 871, 875 n.7 (4th Cir. 1984), *vacated as moot on other grounds*, 757 F.2d 600 (4th Cir. 1985)). The Supreme Court of Virginia also advised that "[i]f any of the non-privileged documents contain client communications not directly related to the published data, those communications, if otherwise privileged, must be removed by the reviewing court before the

document may be produced." *Id.* (quoting *(Under Seal)*, 748 F.2d at 895 n.7).

The privilege derived from "[t]he work-product doctrine is closely related to the attorney-client privilege." *Id.* at 302. Rather than protecting communications, however, the work-product privilege protects the attorney's trial preparations and allows him to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *See Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947) ("Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney."); *United States v. Nobles*, 422 U.S. 225, 238 (1975) ("[T]he work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."). Like the attorney-client privilege, the work-product privilege may be waived. *See Nobles*, 422 U.S. at 239 ("The privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived.").

Unlike the attorney-client privilege, however, the work-product privilege is not waived by mere disclosure but instead by making "testimonial use" of the protected material. *See Nobles*, 422 U.S. at 240 n.14; *FEC v. Christian Coalition*, 178 F.R.D. 61, 76 (E.D. Va. 1998) ("[W]hile the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege."). When a party makes testimonial use of work product, "the normal rules of evidence come into play with respect to cross-examination and production of documents." *Nobles*, 422 U.S. at 240 n.14.

Liddy, as the proponent of the attorney-client and work-product privileges, has the burden of establishing that he has not waived them. *Edwards*, 370 S.E.2d at 301 ("The proponent has the burden to establish that the attorney-client relationship existed, that the communications under consideration are privileged, and that the privilege was not waived."). Liddy has not met this burden in the instances outlined by Wells in her brief.

To support his motion for summary judgment, for instance, Liddy disclosed confidential communications between him and his lawyers and thereby waived his attorney-client privilege. Specifically, in the Supplemental Declaration of G. Gordon Liddy in Support of Motion for Summary Judgment, Liddy made the following declarations:

> Throughout this six-year period of consistent communication with my counsel, counsel has expressed confidence in the *Silent Coup* thesis in general and the DNC/call-girl ring connection in particular. During these telephone conversations counsel in words of substance conveyed to me that the investigation and discovery in the case significantly underscores and reinforces the *Silent Coup* thesis. In fact, counsel has stated to me that the DNC/call-girl/John Dean connection, is particularly bolstered by information uncovered about Louis Russell, who was associated with the Columbia Plaza call-girl ring and who was at the Howard Johnson's restaurant at the time of the June 17, 1972 break-in.

> . . . .

> At my November 7, 1997 deposition, I testified that sometime in 1996, my counsel advised me not to rely on Phillip Bailley as my sole source for information I discuss with listeners and audiences. I was given this instruction after Mr. Bailley's counsel had circulated a letter stating words of substance that Bailley's mental condition had deteriorated to the point that he would not be able to give reliable deposition testimony. Ms. Wells [sic] counsel did not ask me what information was the focus of counsel's instruction. This instruction had nothing to do with Ms. Wells' role in Watergate, because there is abundant evidence corroborating her connection with the call-girl ring servicing the DNC. In view of Mr. Bailley's counsel's 1996 letter concerning Bailley's deteriorating mental condition, my counsel advised that I should not rely on Bailley for the unpublished and uncorroborated information attributed to him in the Stanford proposal about a number of individuals not identified in *Silent Coup*.

(Exh. at 358-60.) Once Liddy decided to reveal these confidential communications, his decision to disclose became final. He may not reattach the privilege now that the issues in the case have "shifted."[13] Fairness, and Virginia's law of privileges, requires complete disclosure of the confidential communications and the details underlying those communications, that is, all preliminary drafts and material, including notes, underlying the communication. *Edwards*, 370 S.E.2d at 301. Because of the disclosures described above, Liddy has waived his privilege to the communications regarding his counsel's "confidence in the *Silent Coup* thesis in general and the DNC/call-girl ring connection in particular" and counsel's advice "not to rely on Phillip Bailley," as well as the details underlying these communications.

With regard to waiver of work-product, Liddy clearly made testimonial use of several privileged documents. The foremost example is the June 11, 1992 letter that Liddy's lawyers sent to counsel for St. Martin's Press providing a detailed analysis of investigation into the *Silent Coup* theory of the Watergate break-ins. At trial, Liddy testified that he had received a copy of this letter and relied on the information.[14] This constituted testimonial use of the letter and any claim to a work-product privilege was waived. Two other instances of testimonial use of work product occurred when Liddy was deposed. First, he stated that he learned of rumors regarding the dismissal of Oliver and Wells from his counsel. Second, the source for his knowledge of Wells dating Baldwin was also his counsel. For all these instances where Liddy made "testimonial use" of work product,[15] the privilege is waived and the rules of discovery and evidence are therefore applicable. *See Nobles*, 422 U.S. at 240 n.14.

---

[13]When asked by the court if he had used privileged material as a sword, Liddy's counsel replied, "Yes, I did. [But] we were involved in an actual malice proceeding at the time. That has shifted. We are not going to do that at trial." (J.A. at 485.)

[14]Liddy also made testimonial use of the June 11, 1992 letter when he was cross-examined during a deposition and indicated that he relied upon it.

[15]General statements Liddy made about correspondence with counsel, such as that he "received a lot of materials [and] communications in the mail from counsel . . ." (J.A. for No. 98-1962 at 1144), do not constitute "testimonial use" and therefore do not constitute a general waiver of all work product ever sent to Liddy.

On the issue of attorney-client and work-product privileges, we reverse the district court's ruling that there was no waiver and remand to allow discovery on the confidential communications that Liddy has disclosed and their underlying details, as well as work-product of which Liddy has made "testimonial use."

VI.

Finally, Wells argues that the district court erred by denying her motion to amend her complaint. On December 29, 1999, over a year before trial, Wells sought permission to amend her complaint to include allegations that Liddy "engaged in a scheme or plan that contained fraudulent activities, including fraudulent conveyances of real estate and other properties and interests." (J.A. at 967.) Specifically, Wells alleged that Liddy transferred significant assets to his wife in an attempt to protect those assets from a potential judgment against him. On October 12, 2000, the district court entered an order denying the motion. The order stated that "[u]pon consideration of the memoranda submitted in connection with the various pending motions filed by plaintiff and the correspondence from counsel pertaining to those motions, it is . . . ordered [that] Plaintiff's motion for leave to file second amended complaint is denied." (J.A. at 992.)

Federal Rule of Civil Procedure 15(a) applies when a party who has already pleaded in a case seeks to amend her pleadings. Fed. R. Civ. P. 15(a). Rule 15(a) provides that "a party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . . Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).

The Supreme Court has demanded that, "[i]n the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962). In application of this mandate, the district court is "in a better position than

we are to determine whether the motion for leave to amend was unduly delayed and whether granting the motion would result in undue prejudice." *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d 479, 483 (4th Cir. 1992). We therefore review the district court's denial to grant leave to amend the complaint for abuse of discretion. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 941 (4th Cir. 1995).

Wells argues that the district court abused its discretion by not giving a reason for its decision. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) ("Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules."). Wells quotes the "curt" language of the district court's October 12, 2000 order and argues that "*nobody* suggested a reason for denying Wells's motion." (Appellant's Br. at 62.) We disagree.

On August 18, 2000, Liddy's attorneys wrote a letter to the district court in response to a letter written by Wells's attorney on August 7, 2000. This letter argued that "there is no reason to address this issue now, or for Wells to raise it - other than to harass Mr. and Mrs. Liddy. This plainly is not a jury issue. As such, Wells's attempt to raise this issue is premature and the Court need not address it now, if ever." (J.A. at 3543.) The letter also pointed out that denying the motion "would not prejudice Wells's right to pursue relief in the future." (J.A. at 3543.) This letter clearly constitutes part of the "correspondence from counsel" upon which the district court relied in rendering its October 12, 2000 ruling. (J.A. at 992.) We conclude that the reasons underlying the district court's denial of Wells's motion were apparent and "as long as its reasons are apparent, a district court's failure to articulate grounds for denying a plaintiff's leave to amend does not amount to an abuse of discretion." *Healthsouth Rehabilitation Hosp. v. American National Red Cross*, 101 F.3d 1005, 1010 (4th Cir. 1996). Moreover, we conclude that those reasons fit within the scope of the district court's discretion. *See* 6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1487 (2d ed. 1990) (explaining that if the district court determines "that the issues raised by the amendment are remote from the other issues in the case and might

confuse or mislead the jury, leave to amend well may be denied"). The district court, therefore, did not abuse its discretion in denying Wells's motion for leave to file a second amended complaint.

### VII.

In conclusion, we hold that a reasonable jury relying on the evidence in the record could find that Liddy was at least negligent in making the allegedly defamatory statements, and we therefore reverse the district court's grant of judgment as a matter of law in favor of Liddy. We affirm the district court's evidentiary rulings with the exception of its exclusion of deposition testimony from Gainsburg and McCormack and its inclusion of evidence that someone calling Phillip Bailley identified herself as Maxie Wells. We reverse the district court on the issue of Liddy's attorney client and work-product privileges, finding an implied waiver due to Liddy's disclosures of confidential information. Finally, we conclude that the reasons justifying the district court's denial of Wells's motion for leave to file a second amended complaint are apparent and proper, and, therefore, that the court did not abuse its discretion. Accordingly, we remand this case to the district court for discovery of the formerly privileged materials described above and a new trial.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS*